**REVERE TRANSDUCERS,
INC., Appellee,**

v.

**DEERE & COMPANY, Appellant.**

No. 97–1009.

Supreme Court of Iowa.

June 3, 1999.

Larry J. Cohrt and Jim D. DeKoster of Swisher & Cohrt, P.L.C., Waterloo, and Joel S. Carter of Deere & Company, Moline, Illinois, for appellant.

Timothy P. Ryan of Eckert Seamans Cherin & Mellott, L.L.C., Pittsburgh, Pennsylvania, and H. Daniel Holm, Jr., of Ball, Kirk, Holm & Nardini, P.C., Waterloo, for appellee.

Thomas J. Miller, Attorney General, Craig Kelinson, Special Assistant Attorney General, and Richard E. Mull, Assistant Attorney General, for intervenor, State of Iowa ex rel. Civil Reparations Trust Fund.

Considered by McGIVERIN, C.J., and HARRIS, LAVORATO, NEUMAN, and CADY, JJ.

McGIVERIN, Chief Justice.

Several questions are presented in this appeal and cross appeal concerning plaintiff Revere Transducers, Inc.'s action against defendant Deere & Company for tortious interference with contractual relations, misappropriation of trade secrets and civil conspiracy. The basis of Revere's claims is that Deere allegedly induced two former Revere employees, Greg Eckart and Francis Delfino, to violate an employment agreement with Revere, start a company, and develop and manufacture a draft sensor device to sell to Deere, which would replace a similar device that Revere was manufacturing and selling to Deere.

A jury returned verdicts in favor of Revere on its claims for tortious interference with contractual relations and civil conspiracy and in favor of Deere concerning Revere's claim for misappropriation of trade secrets.

On Deere's appeal and Revere's cross appeal, we affirm in part, reverse in part and remand.

## I. Background facts and proceedings.

**A. Establishment of relationship between Revere and Deere.** Plaintiff, Revere Transducers, Inc., is a Delaware corporation with its principal place of business in California, and operates a facility in Connecticut. Revere is engaged in the manufacture, marketing and sale of devices called resistive strain gauge force transducers. A force transducer is a device which measures force. A strain gauge is an electrical conductor which measures strain and is a component part of a force transducer.

Defendant Deere & Company is a Delaware corporation with its principal place of business in Illinois. Deere is engaged in the manufacture of tractors and has a facility in Waterloo, Iowa.

In the mid–1980s Deere became interested in locating a company to develop and manufacture a draft sensor device which, when installed on its tractors, would regulate the depth of an attached plow in the ground and monitor the forces on the plow as the tractor was plowing.

In 1986, Deere contacted a number of different manufacturers of strain gauge sensing devices, including plaintiff Revere. Revere and Deere discussed the possibility of using a "Gozinta." A Gozinta is a strain gauge force sensor device developed and manufactured by Revere under the registered trademark "Gozinta."

The Gozinta is a metal capsule or cylinder-shaped device, approximately two inches long. One end of the Gozinta has a ridged or "knurled" surface, similar to the edge of a coin. The Gozinta is pressed into a hole in a member or metal strap and the knurled surface accomplishes an interference fit between the Gozinta and the receiving member. In oversimplified terms, the Gozinta measures the strain produced in the member in which it is inserted.

Inside the metal capsule is a disc with four evenly spaced holes which channel the stress toward four strain gauges mounted on the disc. The holes have a minimum diameter of one-eighth of an inch. Wire pins extend through the holes to the strain gauges and connect the strain gauges to an electric circuit board, or amplifier. The wire pins transfer the strain gauge signal or changes in resistance back through the printed circuit board or amplifier. The signal would eventually be transmitted to the tractor's computer. By drilling a hole in a hitch that attaches a plow to a tractor, and placing a Gozinta in the hole, the force on the plow can be calculated.

The concept of using Revere's Gozinta as a draft sensor in a Deere product was unique. Deere had experience using strain gauges in testing application, but had never used strain gauges in a product.

To formalize their business relationship, Revere and Deere signed an agreement entitled "Non–Disclosure Agreement for Proprietary Information" in June 1986 to protect the proprietary information of the parties.

The initial plan was that Revere would manufacture the Gozinta at its plant in Connecticut. The Gozinta would then be inserted into a Deere designed strap made of forged steel. The Deere metal strap was to be manufactured by a third party. The decision was later made that Revere would be responsible for assembling the completed device, that is, inserting the Gozinta into Deere's metal strap.

Deere was to provide the funding for the unique tooling which would be necessary for the manufacture, assembling and testing of the Gozinta. Deere agreed to purchase a fixed total quantity of Gozintas from Revere, pursuant to a blanket purchase order. The purchase order included language stating that Deere, at its discretion, could terminate the purchase order with 120 days notice. The parties estimated that production quantities of the Gozinta would increase from 5000 in 1989 to 30,000 in 1991. The original price of the Gozinta to Deere was estimated at $129.50 per part but later increased to $138.22.

Revere and Deere worked jointly on the project, and development of the Gozinta draft sensor device consumed the efforts of Deere and Revere over a three to four-year period. Each party had a team of engineers working on the project.

Francis Delfino, a manufacturing engineer, was a member of the Revere team. Delfino was responsible for designing the processes and equipment to manufacture the Gozinta and played an important role in its development. Delfino was hired by Revere on September 15, 1986.

Greg Eckart was another member of the Revere team. Eckart was not an engineer but was a product manager and was the primary contact between Revere and Deere for the Gozinta/Deere project. Eckart was hired by Revere on August 26, 1986.

At the time they were hired, Delfino and Eckart signed agreements whereby they agreed to disclose any inventions or discoveries they made during their employment to Revere and also agreed not to disclose any such inventions or discoveries to others without Revere's consent. The agreement further stated that Delfino and Eckart agreed not to disclose any inventions or discoveries relating to Revere's methods, processes, or apparatus or production of goods or materials for a period of one year following termination from Revere's employment. Delfino and Eckart also agreed to assignment of their rights to Revere in any invention or discovery made by them during their employment by Revere and agreed not to disclose to others at any time during their employment any confidential information, knowledge or data belonging to Revere without first obtaining Revere's written consent. Delfino and Eckart were not bound by any other employment agreement or noncompete agreement and thus were considered at-will employees.

**B. Production problems arose.** According to Revere, Deere was late in supplying the funding for the tooling which prevented Revere from proceeding with development of the Gozinta. The strap forging company chosen by Deere also was late in providing the forged steel straps to Revere. Due to these delays, Revere was forced to begin actual production of the Gozinta without an opportunity to perform preproduction testing or a pilot run.

Revere began actual production of the Gozinta in December 1988. Production was not immediately successful. Problems developed in that the Gozinta produced an excessive output signal and produced an

unpredictable output of the sensor when no load was applied. Initial yields during the first few months of production were in the 17–20% range. (Yield is defined as the percentage of parts produced that passed post-production tests and were actually shipped to Deere.) Because of the low yields, Deere was forced to ship tractors to customers with a temporary part that would have to be replaced later.

Both Deere and Revere worked to solve the problems encountered in manufacturing the Gozinta. After testing and analysis, it was determined that problems with the product were related to the physical dimensions of the Deere metal strap. Deere, however, believed that some of the problems were due to the poor quality of the knurls on the Gozinta that Revere was receiving from its vendor. Deere later learned that Revere had changed suppliers for the knurl, but had not informed Deere.

While Revere and Deere were working to solve the problems associated with the Gozinta/Deere project, Revere was experiencing significant downsizing in its personnel following its purchase in 1988 by Dobson–Park, an English corporation. Several Revere employees who worked on the Gozinta/Deere project either left or were laid off.

Eckart and Delfino were concerned about their positions at Revere. Eckart was informed by his supervisor that Revere's Connecticut plant would be closed in July 1989 and that he should start looking for another job. Delfino was initially assured by his supervisor that his job was secure and that he had nothing to worry about. That particular supervisor was laid off two weeks later. In early 1989, Delfino and Eckart told David Ramsey of Deere that they were scheduled to be let go from Revere.

**C. Deere's search for another sensor supplier.** Although yields of the Gozinta had improved to 95% in the summer of 1989, the Revere Gozinta never completely met Deere's engineering qualification tests. Deere was also concerned about whether Revere would be a long-term viable supplier. Based on these concerns, in addition to the turnover in Revere personnel, Deere, unknown to Revere, started looking for an alternative part for the Gozinta.

To address some of the problems associated with the project, Deere and Revere held a meeting in Waterloo in February 1989. Eckart was not present at the meeting. During the meeting, Ramsey, a Deere engineer, suggested that perhaps the sensor could be welded rather than pressed into place. According to Deere employees, John Elengo, Revere's vice president of engineering, said that he did not think that welding the device would work because it would put too much stress on the sensor and cause it to fail.

In early 1989, Eckart, Revere's product manager for the Gozinta project, was having frequent conversations with Carl Kunath concerning product shipments of the Gozinta and problems associated with it. Kunath was employed by Deere as a buyer/purchasing agent of electronic and mechanical parts for Deere tractors and was Deere's primary contact with Revere on the Gozinta project. During a conversation in early March 1989, the subject of personnel changes at Revere came up. At some point during the conversation, Eckart told Kunath that he intended to leave Revere and develop a consulting engineering business and that he had ideas for installing Gozintas into new products, some of which may be applicable to Deere. Kunath testified he told Eckart that, if he had any ideas, to send Deere a proposal. Kunath testified that he did not invite or solicit Eckart to submit a proposal, but that Eckart mentioned he had an idea and wanted to know if Deere was interested. Kunath told Eckart that he would have to submit the proposal to Deere's engineering department because he was not in the position to receive proposals on engineering ideas or concepts.

After this conversation, Eckart approached Delfino, a lead Revere manufacturing engineer working on the Gozinta/Deere project, and inquired if he would be interested in developing a new draft sensor for Deere that would be welded, rather than pressed, into a hole. Delfino and Eckart agreed to meet one day after work to discuss their ideas. Delfino and Eckart eventually met with a lawyer at Delfino's suggestion. The record contains a letter from an attorney dated March 10, 1989, addressed to Delfino and Eckart regarding their potential liability concerning the manufacture of a welded-in disc sensor. The letter stated that if Delfino and Eckart decided to develop the welded-in sensor, it was extremely important for them not to take any documents, models, or engineering drawings from Revere. The letter also indicated that Delfino and Eckart's contractual obligation regarding disclosure of inventions and discoveries presented the most risk and that the possibility of liability hinged on the definition of inventions and discoveries, but that what Delfino and Eckart were considering was not an invention or discovery in the narrower sense.

Sometime thereafter, but before March 12, Delfino and Eckart formed a company called D E Sensor Manufacturing, Inc.

On March 12, 1989, Delfino and Eckart, through their company D E Sensor, wrote to Kunath at Deere. The letter contains a quotation of estimated cost for "the development and manufacturing of a functional equivalent to sensor assembly part number RE30962 rev H," a replacement part for the Gozinta. The letter also discusses payment schedules for development of the sensor. Attached to the letter were a number of drawings for a new strap assembly and draft sensor components.

Sometime thereafter, Delfino, Eckart and Kunath of Deere met in a hotel in Connecticut to discuss D E's proposal for a welded-in sensor. Neither Delfino nor Eckart informed Revere of the meeting.

On April 11, 1989, Kunath of Deere wrote to Eckart confirming its intention to provide a purchase order in the amount of $172,900 for design and development work by D E of a welded-in sensor, known as a "weldzinta," to replace the Gozinta.

On April 19, Delfino notified Revere that he was terminating his employment effective May 5. On April 26, Eckart notified Revere that he was terminating his employment effective April 28.

Subsequently, in July 1990, Kunath wrote to Revere stating that Deere was canceling its contract for purchasing Gozintas. The letter also stated that "we [Deere] have developed a new product that replaces RE30962 [the Gozinta]," that will begin production at Deere's facility on October 29, 1990.

**D. The Connecticut and present litigation.** Revere eventually discovered that Delfino and Eckart were making a sensor similar to the Gozinta and sued Delfino and Eckart in federal district court in Connecticut in December 1992 for patent and trademark infringement and breach of contract. A noncompete injunction was entered against D E on February 4, 1993.

Revere later filed a petition in the present action against defendant Deere in Iowa district court on August 24, 1993, seeking damages for tortious interference with contractual relations, misappropriation of trade secrets, and civil conspiracy.

On November 30, 1993, Revere dismissed its claims against Delfino and Eckart in the Connecticut federal court action pursuant to a settlement agreement. In return for settlement of all pending disputes against them, and subject to any rights which Revere might have against Deere, Delfino and Eckart executed a promissory note in the amount of $60,000 in favor of Revere. Upon consent of the parties, the district court entered a permanent injunction which permanently enjoined Delfino and Eckart, acting through D E, from manufacturing certain types of sensors.

Revere's claims against Deere in the present action were tried to a jury. The jury returned verdicts on January 14, 1997 for compensatory damages in plaintiff Revere's favor concerning the tortious interference with a contract and the civil conspiracy claims, and awarded $350,000 and $200,000 in damages on those respective claims. The jury found in defendant Deere's favor regarding Revere's claim for misappropriation of trade secrets. The jury also awarded Revere punitive damages in the amount of $450,000, but also found that Deere's acts were not directed against Revere.

Judgment was promptly entered on the verdicts.

The district court later overruled Deere's motions for judgment notwithstanding the verdict and for new trial and Revere's motion for a new trial.

Deere appealed and Revere cross appealed concerning the verdicts and rulings that were adverse to them.

Other facts will be stated as we discuss the assignments of error raised by the parties.

## II. Enforceability of employment agreement.

We first address Deere's contention that the district court erred in overruling Deere's motion for judgment notwithstanding the verdict concerning Deere's position that Revere's employment agreements with Delfino and Eckart were not enforceable and thus cannot be the basis for Revere's claim for tortious interference with a contract.

■ When considering a motion for judgment notwithstanding the verdict on appeal, we view the evidence as the trial court did in ruling on the motion, that is, in the light most favorable to the party against whom the motion was directed. *Faught v. Budlong*, 540 N.W.2d 33, 35 (Iowa 1995).

Iowa Rule of Civil Procedure 243(b) provides:

> If the movant was entitled to a directed verdict at the close of all the evidence, and moved therefor, and the jury did not return such verdict, the court may then either grant a new trial or enter judgment as though it had directed a verdict for the movant.

The purpose of rule 243(b) is to afford the trial court an opportunity to correct its error in failing to sustain a motion for directed verdict where the movant was entitled to a directed verdict at the close of all evidence. *Meeker v. City of Clinton*, 259 N.W.2d 822, 827 (Iowa 1977).

■ A motion for judgment notwithstanding the verdict should be denied if there is substantial evidence to support the claim. *Faught*, 540 N.W.2d at 35. Conversely, absent such evidence, judgment notwithstanding the verdict may be sustained. *Id.* "Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion." *Johnson v. Dodgen*, 451 N.W.2d 168, 171 (Iowa 1990).

A. **Language of the agreement.** At the time they were hired by Revere, Eckart and Delfino each signed an agreement concerning disclosure of confidential information and inventions and/or discoveries and assignment of such inventions and/or discoveries, hereinafter referred to as the Revere agreement or agreement. The Revere agreement included the following provisions:

> (1) *During the period of my employment* I will disclose promptly and in writing to the head of the department or the division in which I am employed, or to such other person as the Company may designate, *all inventions or discoveries which I may make, whether alone or with others, and whether during normal business hours or otherwise, and I will not disclose such inventions or discoveries to others, except as required by my employer, without prior written consent of the Company.*

(2) *For a period of one year following the termination of my employment* for any reason, I will not disclose as hereinbefore provided, all inventions and discoveries made by me which relate to: (1) methods, processes, or apparatus concerned with the production of any character of goods or materials used or sold by the Company, or (2) in respect to any character of goods or materials sold or used by the Company.

(3) I hereby assign all of my right, title, and interest in and to such inventions and discoveries to the Company, and agree that I will, when requested at any time during my employment or thereafter execute specific assignments of any such inventions or discoveries to the Company or its nominee....

....

(5) I acknowledge that *technical information other than that generally published and available to the public* and other confidential information regarding the Company's business of which I may obtain knowledge in the course of and by virtue of my employment by the Company constitute valuable and confidential assets of the Company's business and that unauthorized disclosure thereof would be detrimental to the Company. I therefore agree that I *will not disclose to others at any time during my employment or thereafter any confidential information, knowledge or data* belonging to the Company, without first obtaining the Company's written consent thereto, except as such disclosure may be required by my service to the Company or by law.

(Emphasis added.)

On appeal, Deere contends that the Revere agreement is not enforceable because the language is overly broad and so open-ended as to include inventions and discoveries that are totally unrelated to Revere's business or its employees. Deere thus argues that because the Revere agreement is unenforceable, it cannot be the basis for a claim for tortious interference with a contract.

Before examining whether the Revere agreement is enforceable, we deem it helpful to clarify the applicable standards concerning the enforceability of employment agreements containing nondisclosure-confidentiality or assignment provisions.

We point out that the Revere agreement only addresses Delfino and Eckart's duties concerning disclosure or nondisclosure of confidential information and inventions and/or discoveries, and assignment of rights thereto, made by them during their employment with Revere; the agreement does not contain any noncompete provisions.

**B. Applicable law.** At this point in the analysis, we are only concerned with whether the terms of Revere's agreement with Delfino and Eckart are reasonable. This inquiry is different from whether Delfino and Eckart breached the agreement, which will be discussed later.

We have apparently never addressed the enforceability of an employment agreement containing a nondisclosure-confidentiality provision. We have, however, established certain rules concerning how to determine the enforceability of a noncompete agreement. *See Lemmon v. Hendrickson,* 559 N.W.2d 278, 282 (Iowa 1997) (employment agreement contained nondisclosure provision but validity of provision was not discussed); *Lamp v. American Prosthetics, Inc.,* 379 N.W.2d 909, 910 (Iowa 1986); *Iowa Glass Depot, Inc., v. Jindrich,* 338 N.W.2d 376, 381 (Iowa 1983). We believe that the rules concerning the enforceability of noncompete agreements, as restrictive covenants, may be helpful concerning the enforceability of Revere's agreement with Delfino and Eckart and we therefore briefly review those rules.

We have established the following three-pronged test to be applied in determining whether an employment contract containing a restrictive covenant is enforceable:

(1) Is the restriction reasonably necessary for the protection of the employer's business; (2) is it unreasonably restrictive of the employee's rights; and (3) is it prejudicial to the public interest? *Lamp,* 379 N.W.2d at 910. We have stated that "[c]ovenants not to compete are unreasonably restrictive unless they are tightly limited as to both time and area." *Lemmon,* 559 N.W.2d at 282.

Factors we consider in determining the enforceability of a noncompete agreement include the employee's close proximity to customers, the nature of the business, accessibility to information peculiar to the employer's business, and the nature of the occupation which is restrained. *Jindrich,* 338 N.W.2d at 382. "An employee cannot be precluded from exercising the skill and general knowledge [the employee] has acquired or increased through experience or even instruction while in the employment." *Id.* at 383.

Nondisclosure-confidentiality agreements enjoy more favorable treatment in the law than do noncompete agreements. *See* Terry Morehead Dworkin & Elletta Sangrey Callahan, *Buying Silence,* 36 Am. Bus.L.J. 151, 156–57 n. 30 (1998) [hereinafter Dworkin & Callahan]. This is because noncompete agreements are viewed as restraints of trade which limit an employee's freedom of movement among employment opportunities, while nondisclosure agreements seek to restrict disclosure of information, not employment opportunities. *See id.* The distinction is based on the idea that "[o]nce a secret is disclosed, knowledge of the information cannot nor-mally be confined to a particular area." Restatement (Third) of Unfair Competition § 41 cmt. d. (1995). Thus, imposition of geographic or durational limitations "would defeat the entire purpose of restricting disclosure, since confidentiality knows no temporal or geographical boundaries." 2 Rudolf Callmann, *The Law of Unfair Competition, Trademarks & Monopolies* § 14.04, at 222–23 (Supp.1998) [hereinafter Callmann]. Thus, nondisclosure agreements lacking in geographic or time limitations have been held to be enforceable. *See* Dworkin & Callahan, at 156–57 n. 30.

Some states, however, either because of statutory law or public policy, require some form of geographic or time limitations in order for a nondisclosure agreement to be enforceable. *See* Callmann, § 14.04, at 225–26 n. 19.52 (Supp.1998) (noting that even after Illinois and Georgia enacted statutes stating that contractual duties regarding secrecy of trade secrets shall not be deemed void or unenforceable solely for lack of durational or geographical requirements, courts in those states still held nondisclosure agreements invalid for lack of such restrictions).

Additionally, some states consider nondisclosure-confidentiality agreements to be a restraint of trade and such agreements are therefore regulated by state statutes governing contracts in restraint of trade.[1]

Employment agreements requiring an employee to assign to the employer rights to inventions designed or conceived during the period of employment have been upheld. *See Ingersoll–Rand Co. v. Ciavatta,*

---

1. *See Nalco Chem. Co. v. Hydro Technologies, Inc.,* 984 F.2d 801, 803 (7th Cir.1993) (quoting Wisconsin Statute § 103.465 which provides that a covenant not to compete is lawful and enforceable "only if the restrictions imposed are reasonably necessary for the protection of the employer or principal"); *State Med. Oxygen v. American Med. Oxygen,* 240 Mont. 70, 782 P.2d 1272, 1274–75 (1989) (discussing Montana statute); *Central Monitoring Serv. v. Zakinski,* 553 N.W.2d 513, 515 (S.D.1996) (stating that nondisclosure agreements are considered contracts in restraint of trade and are thus examined under South Dakota statutes prohibiting contracts in restraint of trade, citing South Dakota Codified Law § 53–9–8).

Iowa Code section 553.4 states in part, "[a] contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market." Deere does not argue that the Revere agreement violates section 553.4 and thus we need not consider the applicability of that section to Revere's agreement with Delfino and Eckart.

110 N.J. 609, 542 A.2d 879, 886 (1988); Callmann, § 14.27, at 95 (1996) (agreements to assign all inventions and improvements in employer's field, patentable or unpatentable, which are developed by employee during employment belong to employer and such agreements are not invalid or unenforceable as an unreasonable restraint of trade); 27 Am.Jur.2d *Employment Relationship* § 233, at 735 (1996). We have said that

> In the absence of special agreement to the contrary, an invention and a patent secured for it belong to the inventor, even though the invention was made during the period of his employment, and the invention relates to the matter in which the inventor was employed.

*Bandag, Inc. v. Morenings,* 259 Iowa 998, 1002, 146 N.W.2d 916, 918 (1966) (emphasis added) (quoted source omitted) (concluding that plaintiff-employer was not entitled to right and title to patentable formulas developed by employee during employment where employer had no agreement requiring employees to assign inventive ideas to employer). The determining factor of whether assignment-of-rights-agreements are enforceable seems to be one of reasonableness. *See Ingersoll–Rand,* 542 A.2d at 886 ("Courts ... will not enforce invention assignment contracts that unreasonably obligate an employee in each and every instance to transfer the ownership of the employee's invention to the employer.").

■ **C. Application of law to facts.** Upon consideration of the principles discussed above, we conclude that the following test should be applied in determining whether a nondisclosure-confidential or invention assignment agreement is enforceable:

(1) Is the restriction prohibiting disclosure reasonably necessary for the protection of the employer's business;

(2) is the restriction unreasonably restrictive of the employee's rights; and

(3) is the restriction prejudicial to the public interest?

This test is obviously the same as that used to determine the enforceability of a noncompete agreement. We further conclude, however, that the absence of restrictions concerning time or geographic location do not render a nondisclosure-confidentiality, agreement presumptively unenforceable. This is because the inquiry whether the nondisclosure agreement unreasonably restricts the employee's rights would address the breadth of the restrictions regarding disclosure. Having articulated the proper standard, our next task is to apply it.

■ The Revere agreement imposed basically three types of restrictions on Delfino and Eckart concerning disclosure of Revere proprietary information. First, the agreement required Delfino and Eckart to disclose to Revere any inventions and/or discoveries made by them during the course of their employment and also required them to assign their rights to any such inventions or discoveries to Revere. Second, the agreement precluded Delfino and Eckart from disclosing inventions and/or discoveries related to "methods, processes or apparatus concerned with the production of any character of goods or materials used or sold by the Company." Third, the agreement precluded Delfino and Eckart from disclosing "any confidential information, knowledge or data belonging to the Company."

Upon our review, we conclude that the restrictions in the agreement concerning disclosure of, and assignment of rights to, inventions and/or discoveries and confidential information, knowledge or data are reasonably necessary to protect Revere's business interests. We believe an employer has the right to preclude its employees from disclosing such information. The language in paragraph five of the agreement regarding "technical information other than that generally published and available to the public" contemplates that an employee is only precluded from disclosing information that would not generally be

known by the public. We thus conclude that the restrictions concerning disclosure are sufficiently narrow in scope such that they do not interfere with Delfino and Eckart's ability to use skills and general knowledge they acquired through employment with Revere in future employment. We further conclude that the invention assignment provision is reasonable and enforceable. Nor do we find any evidence in the record showing that enforcement of the restrictions is prejudicial to the public interest. The question of what information would constitute an invention or discovery or may be classified as confidential information, knowledge or data is more related to the inquiry regarding whether Delfino and Eckart breached the agreement and will be discussed later.

We thus conclude that Revere's agreement with Delfino and Eckart concerning disclosure of Revere's business information and assignment of inventions and discoveries is enforceable. The district court therefore properly overruled Deere's motion for judgment notwithstanding the verdict concerning this issue.

## III. Evidence concerning Revere's claim for tortious interference with contractual relations.

Having determined that Revere's agreement with Delfino and Eckart is valid and enforceable, we next consider Deere's contention that even if the agreement is enforceable, the evidence is not sufficient to support the jury's verdict that Deere tortiously interfered with Revere's nondisclosure agreement with Delfino and Eckart. This issue was raised by Deere's motions for directed verdict and for judgment notwithstanding the verdict.

### A. Standard of review.

■ This action was tried at law. In such cases, we review for correction of errors of law. Iowa R.App.P. 4. Our scope of review in such cases is quite limited and factual findings of the jury are binding upon us if supported by substantial evi-

dence. Iowa R.App.P. 14(f)(1); *Toney v. Casey's General Stores, Inc.*, 460 N.W.2d 849, 851 (Iowa 1990). We examine the evidence in a light most favorable to the verdict. *Toney*, 460 N.W.2d at 851–52. We are, however, not bound by the district court's application of legal principles or conclusions of law. *Power Eng'g ·& Mfg., Ltd. v. Krug Int'l*, 501 N.W.2d 490, 493 (Iowa 1993).

### B. Analysis.

■ Instruction no. 11 informed the jury that in order to recover on its claim for intentional interference with a contract, Revere had to prove all of the following:

(1) The Plaintiff had written contracts with Gregory Eckart and Francis Delfino.

(2) The Defendant knew of those contracts.

(3) The Defendant intentionally and improperly interfered with those contracts.

(4)(A) The interference caused Gregory Eckart and Francis Delfino to breach their contracts.

### OR

(B) The interference caused Plaintiff's performance of the contract to be more burdensome or expensive.

(5) The amount of damages caused.

This is a correct statement of the law. *See Jones v. Lake Park Care Center, Inc.*, 569 N.W.2d 369, 377 (Iowa 1997) (quoting *Nesler v. Fisher & Co.*, 452 N.W.2d 191, 198 (Iowa 1990)); *Robert's River Rides v. Steamboat Dev. Corp.*, 520 N.W.2d 294, 303 (Iowa 1994).

### 1. Existence of contract.

We concluded above that Revere had an enforceable agreement with Delfino and Eckart. Revere thus presented substantial evidence to satisfy the first element.

## 2. Knowledge of the agreement.

Deere contends Revere presented no evidence to prove that it had knowledge of Revere's agreement with Delfino and Eckart.

■ Jury instruction no. 13 stated:

In order for you to find for the Plaintiff, you must determine that the Defendant knew of the existence of a contract. It is not necessary that the Defendant had actual knowledge of the specific contract. It is sufficient that the Defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to the disclosure of the contractual relationship between the Plaintiff and Francis Delfino and Gregory Eckart.

We believe that the jury instruction correctly states the law concerning the knowledge element of a claim for tortious interference with contract. *See Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn.1998) ("Tortious interference is not justified when a plaintiff demonstrates that the 'defendant had knowledge of facts which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and rights of the parties.' ") (quoting *Swaney v. Crawley*, 154 Minn. 263, 265, 191 N.W. 583, 584 (1923)); Callmann, § 9.01.50, at 99 (1996) ("There must be knowledge by the defendant ... of the contract or relationship interfered with; or at least of sufficient facts which, if followed by reasonable inquiry, would have revealed it.").

Eckart testified that Delfino told Baxter and Kunath of Deere about their employment agreements with Revere prior to the time they resigned. The record also shows that Delfino made statements to Deere employees about an employment agreement with Revere. The record also includes notes that Kunath of Deere wrote to himself concerning the formation of D E Sensor. The notes contain comments regarding "signed corp. papers as D E Sensor Mfg. Inc," "their lawyer recommended talking to pat atty," "lawyer recommended leave Revere within a short time." These notes were obviously written before Delfino and Eckart left Revere. Additionally, the jury could infer from these notes that Delfino and Eckart told Kunath about their employment agreement with Revere and their lawyer's comments on the subject. Baxter of Deere testified he signed an agreement whereby he agreed to assign any patent rights to Deere.

On the other hand, Deere employees Kunath, Baxter, Dewey and Ramsey testified on Deere's behalf that they either did not know or did not inquire whether Delfino and Eckart had a nondisclosure-confidentiality agreement with Revere.

■ We conclude that substantial evidence exists in the record to support the jury's verdict that Deere had knowledge of sufficient facts to put it on notice regarding Revere's agreement with Delfino and Eckart concerning disclosure of confidential information and/or discoveries and inventions and assignment of rights thereto. While the evidence presented was conflicting, it was the jury's duty to evaluate the evidence and make a decision concerning whether Deere had knowledge of Revere's agreement with Delfino and Eckart.

## 3. Evidence regarding breach.

■ In order to find in favor of Revere concerning its claim of tortious interference with business relations, the jury had to find that Delfino and Eckart violated their agreement with Revere concerning disclosure of Revere's proprietary information and assignment of rights to inventions. *See Iowa–Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993) ("questions of performance or breach are for the jury").

Deere argued to the jury that the March 12 proposal did not contain confidential information or trade secrets belonging to Revere, but rather that the drawings were in fact based on prior art of a welded-in sensor. Deere also presented evidence that drawings of the Gozinta that Revere

submitted to Deere did not contain proprietary stamps, which were required if the information was to be considered confidential between the parties. Deere thus contends that Revere cannot argue that information Delfino, and Eckart disclosed in the March 12 proposal was confidential when in fact Revere disclosed essentially the same information to Deere.

Upon our review, we conclude that substantial evidence supports the jury's verdict that Delfino and Eckart breached their agreement with Revere either based on the conclusion that they made a discovery or invention which they failed to disclose or assign to Revere, or wrongfully disclosed confidential information, knowledge or data.

First, the agreement required Delfino and Eckart to disclose or assign any inventions and/or discoveries to Revere made during the course of their employment and likewise precluded them from disclosing confidential information, knowledge or data belonging to Revere. Trade secrets would clearly fall within the definition of confidential information. Revere thus did not have to prove that the confidential information disclosed amounted to a *trade secret*, but rather only had to convince the jury that information depicted in the March 12 proposal amounted to a discovery or invention or that the proposal contained confidential information, knowledge or data belonging to Revere.[2] This fact is consistent with the jury's finding that Deere tortiously interfered with Revere's agreement with Delfino and Eckart, but did not misappropriate Revere's trade. secrets.

Second, Revere presented evidence from which the jury could conclude that Delfino and Eckart's March 12 proposal to Deere contained confidential information, knowledge or data, belonging to Revere that was not generally published or made available to the public, including to Deere. By comparing the drawings depicted in D E's March 12 proposal to Deere with Revere's original drawings of the Gozinta, Elengo of Revere testified that in his opinion the diameter of the holes depicted in the March 12 proposal were identical to those depicted in the drawings of Revere's Goz-

**2.** *See Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp.*, 401 F.Supp. 1102, 1114 (E.D.Mich.1975) (nondisclosure agreement applied not only to trade secrets but also to privileged, proprietary and confidential information and therefore employees could be liable for breach of agreements if they used or disclosed confidential information, knowledge or technology gained during their former employment even though such information, knowledge or technology is not itself a trade secret); Callmann, § 14.03, at 21 (employee has obligation not to disclose confidential information revealed to him or her in the course of employment "and it is immaterial that such information might not technically qualify as a trade secret"); *Den–Tal–Ez, Inc. v. Siemens Capital Corp.*, 389 Pa.Super. 219, 566 A.2d 1214, 1224 (1989) ("Certain information protected by agreement may be protected *only* by agreement, as it is considered by a business to be confidential, while not necessarily qualifying as 'trade secrets,' " noting that terms "confidential information" and "trade secrets" "do not equate" and may refer to different classes of information); Robert Unikel, *Bridging the "Trade Secret" Gap: Protecting "Confidential Informa-*

*tion" Not Rising to the Level of Trade Secrets,* Loy.U.Chi.L.J. 841, 858 (1998) [hereinafter Unikel] (noting that express contracts can protect commercially valuable knowledge that does not constitute technical trade secrets and that a claim for tortious interference with contractual relations may be asserted against a third party (generally a competing company) that knowingly and intentionally entices an information owner's employees to breach their contractual duties of confidentiality).

The above commentator has suggested that a second category (in addition to the trade secret category) of protectable, proprietary, information should be created—"confidential information." Unikel, at 842. This category would include information that would neither qualify as a trade secret nor "general skill and knowledge." *Id.* This commentator states that confidential information is entitled to the same level of protection as the trade secret category "because both categories of information afford their owners competitive advantages over rivals who do not actually possess such information and who might seek to 'obtain' (rather than to develop) that information in the absence of legal barriers." Unikel, at 871.

inta. Elengo also testified that the diameter of holes depicted in a document entitled Draft Sensor Development Program, D E Sensor Manufacturing, were Revere trade secrets, that this information was not publicly available and that this information was not disclosed in the Gozinta patent. Additionally, Elengo testified that Delfino and Eckart had access to Revere's drawings of the Gozinta during the course of their employment with Revere and further testified that the device described in the March 12 proposal could not have been designed in four or five days without using Revere's trade secrets.

A proprietary stamp appears on Revere's drawings of the Gozinta stating, "[t]his drawing contains proprietary information which shall not be reproduced or transferred to other drawings or disclosed to others or used for manufacturing or any other purpose without written permission of Revere Corporation of America." Delfino and Eckart were thus put on notice that Revere considered any information that appeared in the Gozinta drawings to be confidential. Delfino and Eckart likewise affixed a proprietary stamp with language similar to Revere's stamp on the drawings they submitted with the March 12 proposal, which the jury could find incorporated Revere confidential proprietary information.

Deere presented evidence through its witness, Walt Jacobson, the inventor of the Gozinta, that size and placement of the strain gauges, and all the other features of the product are allegedly common knowledge. Jacobson also testified that what he invented, or the strong part of the invention, was the knurl feature of the device. Deere also presented evidence that the idea of welding a sensor had been the subject of prior patents.

Despite this testimony, and even if true, the jury could still conclude that the Gozinta drawings as a whole, on which D E's March 12 proposal was based, represented the substantial time and money expended by Revere in how it thought the sensor should be designed and manufactured. It was this specific information that Delfino and Eckart acquired by virtue of their employment with Revere and it was this information which they were precluded from disclosing under their agreement to the detriment of Revere. *See Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 229–30 (Iowa 1977) (rejecting defendant's contention that he had right to take skills and knowledge he acquired during employment with former employer, including formulas and information contained in "buy books" and "cost books" because they were the result of his efforts; knowledge acquired by employee cannot be used to injury of employer during employment) (quoting *Sperry Rand Corp. v. Rothlein*, 241 F.Supp. 549, 564–65 (D.Conn.1964)); Callmann, § 14.12, at 53 (1996) (one who receives information in a confidential capacity has a duty not to use or disclose such information even though others might already be aware of it).[3]

Additionally, we find no merit in Deere's contentions that the device D E actually sold to Deere was different from that outlined in the original proposal. The critical facts are that Delfino and Eckart, while still employed by Revere, began working on a device, prepared drawings and designs that incorporated Revere's confidential information, and disclosed this information to a third party. From this evidence the jury could reasonably find

---

**3.** As one commentator explains:

> While he [or she] is still employed, irrespective of a trade secret, an employee should be forbidden from making any disclosures which could be used adversely to the interests of [the] employer. The employee must not reveal any formula or production method, even though it may not be secret or can be revealed by [ ] analysis.... [R]egardless of the status of the formula or production method as a trade secret, it is reasonable to demand that the employee, even after the term of employment, not disclose the fact that the employer uses or has used that particular formula or production method.

Callmann, § 14.22, at 80 (1996).

that D E's March 12 proposal for a sensor was substantially similar to Revere's Gozinta or at least used Revere's designs of the Gozinta as a starting point for D E's sensor. *Cf. Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 315 (Iowa 1998) (noting that minor modifications did not insulate defendant from liability for misappropriation of trade secrets where evidence showed later device was based on plaintiff's diagram). At the very least, the jury could find that Delfino and Eckart used the technology. Revere had developed with respect to the Gozinta, including the problems associated with the knurl strap interface, to develop a welded-in sensor to Revere's detriment. In effect, Delfino and Eckart took Revere's proprietary information concerning what would not work and used it as a basis to develop a device that would directly compete with Revere.

We also reject Deere's contention that the terms of Revere's agreement with Deere concerning what those parties defined as proprietary information, and how that information was disclosed, somehow dictates what information is considered to be confidential under Revere's agreement with Delfino and Eckart. Each agreement establishes its own restrictions and responsibilities upon the parties governed thereunder and the terms of one are not applicable to the other.

The record also shows that Delfino and Eckart consulted with a patent attorney concerning whether the welded-in disc sensor was a patentable device and that the attorney opined that the device was patentable. We believe that the jury could conclude from this and other evidence presented that Delfino and Eckart's

work on developing the replacement for the Gozinta, following their employment with Revere, amounted to an invention or discovery which Delfino and Eckart were required to disclose to Revere and which they wrongfully disclosed to Deere.

Upon our review of the record, we conclude that the jury's finding that Delfino and Eckart breached their agreement with Revere is supported by substantial evidence.

### 4. Evidence regarding intentional and improper interference.

 We now consider the evidence relating to the intentional/improper interference element.[4]

 Instruction no. 14 stated that, in determining whether Deere's conduct was improper, the jury could consider the following factors:

1. The nature of the conduct.

2. The Defendant's motive.

3. The interests of the party with which the conduct interferes.

4. The interest sought to be advanced by the Defendant.

5. The social interests in protecting the freedom of action of the Defendant and the contractual interests of the other party.

6. The nearness or remoteness of the Defendant's conduct to the interference.

7. The relations between the parties.

This is a correct statement of the law. *See Jones*, 569 N.W.2d at 377.

Upon our review of the record, we conclude substantial evidence exists in the

---

4. Deere contends that Revere had to prove that Deere's *predominant* purpose was to injure or destroy Revere's business. Revere on the other hand, contends that proof of a predominant motive to injure or destroy its business is only required in cases of tortious interference with *prospective* business relations and need not be established in cases alleging tortious interference with existing contracts, like Revere's agreement with Delfino and Eckart.

The court's instruction regarding intentional interference followed I Iowa Uniform Jury Instructions (Civil) No. 1200.6, the instruction for interference with an *existing* contract. Neither of the parties objected to the language of the instruction concerning the "improper" element. Thus, the principles of law stated in the instruction became the law of the case. *See Ezzone v. Riccardi*, 525 N.W.2d 388, 393 (Iowa 1994); *Tarrell v. Erdmann*, 221 N.W.2d 504, 507 (Iowa 1974).

record from which the jury could conclude that Deere intentionally and improperly interfered with Revere's agreement with Delfino and Eckart.

Revere presented evidence that Kunath of Deere allegedly contacted Eckart concerning a proposal for a device to replace the Gozinta, while Deere contends that it was Eckart who contacted Kunath. Regardless of who actually initiated the idea for the proposal, Delfino, Eckart and Kunath not only discussed the idea of developing an alternative to replace the Gozinta, but took affirmative steps towards development and manufacturing such a device. All of this was done, including Deere's promise that it would appropriate the funds for development, while Delfino and Eckart were still employed by Revere and when Deere, through its employees, had knowledge or were on notice of Delfino and Eckart's agreement with Revere concerning disclosure of inventions and/or discoveries and confidential information.

Furthermore, not only did Deere, Delfino and Eckart purposely not disclose their activities to Revere, but the parties also continued their relationship with Revere, giving Revere a false sense of security that Deere would continue to purchase Gozintas. Evidence in the record also shows that Deere asked Revere's permission to consult with former Revere employees about problems associated with the Gozinta/Deere project, yet did not bother to mention to Revere that it was negotiating a business deal with current employees for a replacement part for the Gozinta. Deere also encouraged Delfino and Eckart to stay on at Revere, according to Kunath, to ensure that Deere continued to receive "good product." Eckart also testified he would not have sent a bid to Kunath regarding the replacement part for the Gozinta if Kunath had not told him to do so.

While Deere certainly had the right to persuade Delfino and Eckart to work for Deere at some time in the future, Deere had no right to induce Delfino and Eckart to breach their agreement with Revere concerning disclosure of Revere's confidential information. *Cf. Moye v. Eure*, 21 N.C.App. 261, 204 S.E.2d 221, 223 (1974) (noting that defendant, a competitor of plaintiff, had right to persuade plaintiff's employees to work for defendant, so long as defendant did not induce employees to breach any existing contracts; plaintiff had no contract with its former employees and thus defendant could not be held liable for tortious interference with contract). The fact that the idea of a welded-in sensor was presented and rejected by Revere did not relieve Delfino and Eckart of their ongoing duty to refrain from disclosing Revere's confidential information, knowledge or data, or their duty to disclose their inventions or discoveries to Revere.

We conclude that substantial evidence exists in the record to support the jury's verdict that Deere intentionally and improperly interfered with Revere's agreement with Delfino and Eckart. Accordingly, the district court properly overruled Deere's motion for judgment notwithstanding the verdict on this issue.

## IV. Is the jury's verdict concerning Deere's liability for conspiracy supported by substantial evidence?

As we will explain later, Revere cannot recover damages for both its tortious interference with contract and civil conspiracy claims. We therefore need not consider whether the jury's verdict concerning liability on the civil conspiracy claim is unsupported by substantial evidence as Deere contends on appeal.

## V. Error regarding jury's award of compensatory damages.

Deere also raises several assignments of error concerning the compensatory damage awards as calculated by the jury.

### A. Were the jury's awards for tortious interference and civil conspiracy supported by the evidence?

Deere first contends that the jury's awards of damages concerning Revere's

claims for tortious interference with contract and civil conspiracy were not supported by the evidence.

■■■ "We will not set aside or alter a judgment regarding damages unless it is (1) flagrantly excessive or inadequate, or (2) shocks the conscience or sense of justice, or (3) raises a presumption it is the result of passion, prejudice or other ulterior motive, or (4) *lacks evidential support."* *Claus v. Whyle,* 526 N.W.2d 519, 525 (Iowa 1994). "In reviewing damage awards, we consider the evidence in the light most favorable to the plaintiff." *Id.* We thus will uphold an award of damages "so long as the record discloses a reasonable basis from which the award can be inferred or approximated," *Westway Trading Corp. v. River Terminal Corp.,* 314 N.W.2d 398, 403 (Iowa 1982), and will not disturb an award of damages on appeal that is within the range of evidence presented, *Hawkeye Motors, Inc., v. McDowell,* 541 N.W.2d 914, 918 (Iowa App.1995).

■■■ Upon our review, we conclude that substantial evidence exists to support the jury's awards of damages for tortious interference with contract and civil conspiracy. Both parties called witnesses who testified concerning Revere's alleged lost profits as a result of Deere's decision to terminate its contract with Revere and instead utilize the D E Sensor device. Not surprisingly, the experts did not agree on the amount or method of computing lost profits. Lost profits was the only measure of damages submitted to the jury as to each of Revere's claims. We believe that any question regarding the proper amount of damages related more to the weight of the evidence, rather than lack of proof. It was the jury's responsibility to assess damages for lost profits and it did so. *See Sallis v. Lamansky,* 420 N.W.2d 795, 799 (Iowa 1988) (fixing amount of damages is function for the jury). Revere's evidence showed over $800,000 in lost profits, while Deere's expert witness testified that Revere only sustained lost profits in the range of $50,000 to $70,000. The jury's damages award is supported by and was within the range of the evidence presented.

## B. Alleged error regarding loss of profits jury instruction.

Deere also contends that the district court erred by refusing to submit its requested jury instruction concerning calculation of loss of profits.

Our standard of review regarding challenges to jury instructions is stated above.

The court's jury instruction No. 28 concerning damages for loss of profits by Revere stated as follows:

If you should find, from a preponderance of the evidence in this case, that the Plaintiff is entitled to a verdict, the law provides that the Plaintiff is to be fairly compensated for all damages, if any, to its business, which were proximately caused by the Defendant's conduct. In arriving at the amount of any loss of profits sustained by the Plaintiff, you are entitled to consider any past earnings of the Plaintiff in the business in question, as well as any other evidence in the case bearing upon the issue.

If you should find, from a preponderance of the evidence in this case, that damage to Plaintiff's business in the form of lost profits was proximately caused by the Defendant's wrongful conduct complained of, then the circumstance [that] the precise amount of the Plaintiff's damages may be difficult to ascertain should not affect the Plaintiff's recovery.

On the other hand, damages for lost profits must be established with reasonable certainty and may not be based upon speculation and conjecture. There must be a reasonable basis in the evidence for determining that the Plaintiff has, in fact, suffered a loss of profits, even though the amount of such loss is difficult to ascertain.

The court refused to submit to the jury an instruction requested by Deere that would attempt to establish a formula for determining lost profits. Deere contends that the district court erred in telling the jury that any damages awarded should be based on gross profits, rather than net profits and that the jury was left to arbitrarily fix the amount of damages because there was no mathematical formula mentioned in the instructions to guide it.

We conclude that the district court properly instructed the jury regarding calculation of loss of profits. We do not believe that a jury instruction on loss of profits must include a mathematical formula. *See* 22 Am.Jur.2d *Damages* § 989, at 1029 (1988) (trial court "is not bound to formulate or prescribe a method of computation which the jury should pursue in determining damages"). As noted above, each party presented evidence concerning Revere's lost profits and each party presented a different method for calculating lost profits damages. What evidence the jury chose to believe and what award of damages it thought was appropriate was its decision. The damages award was within the range of the evidence and we will not interfere with it. *Hawkeye Motors*, 541 N.W.2d at 918.

## C. Duplication.

Three verdict forms were submitted to the jury, with the court's instructions, one for each theory of plaintiff Revere's recovery: (1) intentional interference with a business contract, (2) misappropriation of trade secrets, and (3) civil conspiracy. The jury awarded Revere damages against Deere in the amount of $350,000 on Revere's tortious interference claim and awarded $200,000 in damages against Deere on the civil conspiracy claim. The jury found in favor of Deere concerning Revere's claim for misappropriation of trade secrets.

Deere contends that the district ·court erred by submitting special verdict forms to the jury that allowed it to award damages for both tortious interference with contractual relations and civil conspiracy. Deere asserts that an award of damages on both theories is duplicative because its gives double recovery for the same injury—loss of profits. This issue was raised in Deere's objections to jury instructions and in its motion for judgment notwithstanding the verdict.

"A 'successful plaintiff is entitled to one, but only one, full recovery, no matter how many theories support entitlement.' " *205 Corp. v. Brandow*, 517 N.W.2d 548, 551 (Iowa 1994) (quoting *Clark–Peterson Co. v. Independent Ins. Assocs.*, 514 N.W.2d 912, 915 (Iowa 1994)). "Duplicate or overlapping damages are to be avoided." *Team Cent., Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 925 (Iowa 1978).

In *205 Corp.* a jury awarded damages for misappropriation of trade secrets ($145,000) and inducement to breach a duty of loyalty ($195,000). 517 N.W.2d at 549–50. We concluded that the misappropriation claim and the inducement claim were alternative theories of recovery for the same injury and that to allow recovery for both claims was clearly duplicative. *Id.* at 551. We therefore ordered that the case be remanded so that judgment could be amended so as to allow recovery for the claim regarding inducement to breach a duty of loyalty, which was the claim on which the jury awarded a greater amount of damages. *Id.* We reached a similar result in *Team Central.* 271 N.W.2d at 924 (plaintiff only entitled to collect on damages award for tortious interference with business claim and not for separate claims of wrongful attachment, trespass, and conversion).

Here, Revere alleged three theories of recovery, but only one type of damage was submitted to the jury—lost profits. Following our decisions in *205 Corp.* and *Team Central*, we conclude that to allow Revere to recover damages both for its tortious interference with contract and civil conspiracy claims would be duplicative

recovery. We thus conclude that the jury's damages award on the tortious interference claim should stand and that the verdict on the civil conspiracy claim fall. We therefore reverse as to this issue and remand the case so that the judgment can be amended for entry of judgment for compensatory damages only on Revere's claim for tortious interference with contract in the amount of $350,000 plus applicable interest.

## VI. Punitive damages.

### A. Was there a basis to submit the punitive damages issue to jury?

██ Deere contends that insufficient evidence was presented to support the submission of Revere's punitive damage claim to the jury.

██ The evidence to support an award must be clear, convincing and satisfactory. *See* Iowa Code § 668A.1(1)(a); *accord Wilson v. IBP, Inc.*, 558 N.W.2d 132, 142 (Iowa 1996) (*Wilson I*). Conduct that establishes a "willful and wanton disregard for the rights or safety of another" will support an award of punitive damages. *Wilson I*, 558 N.W.2d at 142 (citing Iowa Code § 668A.1(1)(a)). We have approved the following definition of "willful and wanton" conduct for section 668A.1(1) purposes:

> [T]he actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.

*Fell v. Kewanee Farm Equip. Co.*, 457 N.W.2d 911, 919 (Iowa 1990) (quoting *Prosser and Keeton on Torts* § 34, at 213 (1984)); *accord Midwest Home Distrib. v. Domco Indus.*, 585 N.W.2d 735, 743 (Iowa 1998). "Only evidence that is relevant to the underlying wrong for which liability is imposed can support an award of punitive damages." *Wilson I*, 558 N.W.2d at 142.

As previously noted, the evidence shows that Deere conversed with Delfino and Eckart, while they were still employed by Revere, to develop a device that would directly compete with Revere. Deere received confidential information belonging to Revere from Delfino and Eckart, knowing that they were bound by a nondisclosure-confidentiality agreement. Deere employees testified they did not want Revere to know about their discussions with Delfino and Eckart. Deere continued to purchase Gozintas from Revere for almost one year while secretly developing with D E a replacement part for the Gozinta. Based on this information, the jury could infer that Deere intended to give Revere a false sense of security concerning its future purchases of Gozintas. We believe that this evidence was sufficient to justify submission of the issue of punitive damages to the jury. We therefore affirm the district court's decision to submit the punitive damage issue to the jury.

### B. Iowa Code section 668A.1(2)(b).

██ Although not raised in the parties' briefs, we discovered a possible issue in this case concerning the interplay between the jury verdicts and the judgment entered on Revere's punitive damages verdict and the provision of Iowa Code section 668A.1(2)(b).

The district court submitted special interrogatories to the jury concerning punitive damages. The jury awarded punitive damages in the amount of $450,000 against defendant Deere, but answered "no" to the question, "Was the conduct of the Defendant directed specifically at the Plaintiff?" Promptly after the verdicts were returned, the district court entered judgment against the defendant for $1,000,000 plus interest. The $1,000,000 figure included the $450,000 in punitive damages plus $550,000 in compensatory, damages awarded by the jury for the tortious interference with contract and civil conspiracy, claims.

The court's judgment, however, made no reference to the provision in section

668A.1(2)(b) which requires that, if the answer to the question set forth above is negative, the court shall distribute the award of punitive damages as follows:

> after payment of all applicable costs and fees, an amount not to exceed twenty-five percent of the punitive or exemplary damages awarded may be ordered paid to the claimant, with the remainder of the award to be ordered paid into the civil reparations trust fund administered by the state court administrator.

We entered an order allowing the parties, and the attorney general in behalf of the Civil Reparations Trust Fund after intervention on appeal, to file statements addressing whether the judgment entered upon the punitive damages award, if upheld by us, should be modified to reflect the provisions of section 668A.1(2)(b). We also allowed the attorney general to respond to this issue during oral argument.

In prior cases, we have explained that the distribution under section 668A.1(2)(b) of a punitive damages award shall be in the following order:

> (1) payment of attorney's fees
>
> (2) after payment of attorneys fees, payment of 25% of the total punitive damages award together with interest to plaintiff; and
>
> (3) after satisfying 1 and 2, the remainder, plus interest, to the Civil Reparations Trust Fund.

See *Wilson I*, 558 N.W.2d at 148; *Fernandez v. Curley*, 463 N.W.2d 5, 8–9 (Iowa 1990).

Because the district court did not follow the mandate of section 668A.1(2)(b), we, sua sponte, order that upon remand the court shall hold an evidentiary hearing concerning the proper distribution of plaintiff Revere's punitive damages award in accordance with section 668A.1(2)(b) and our prior cases bearing on this issue. *See Wilson v. IBP, Inc.*, 589 N.W.2d 729, 730 (Iowa 1999) (*Wilson II* ); *Wilson I*, 558 N.W.2d at 148; *Fernandez*, 463 N.W.2d at 8–9. The district court shall then modify the present judgment concerning punitive damages as appropriate.

■■■ We discovered during oral argument that there is no established procedure by which the Civil Reparations Trust Fund is notified that a verdict on a punitive damages award has been entered in district court and that the jury has found that the defendant's acts were not directed at the plaintiff, thus implicating possible benefits to the Civil Reparations Trust Fund under section 668A.1(2)(b). As a result, the Civil Reparations Trust Fund sometimes learns of such awards by notice from the court and sometimes by newspaper or television. Knowing of no other present procedural rule which would ensure notice to the Civil Reparations Trust Fund in cases such as the present one, we direct that upon entry of a verdict on a punitive damages award that falls under section 668A.1(2)(b), the district court shall cause notification to the Civil Reparations Trust Fund by order setting forth the punitive damages award and the jury or fact finder's findings. The Civil Reparations Trust Fund may then intervene in the proceedings as appropriate.

## VII. Did the district court properly reject Deere's statute of limitations defense?

■■■ Eckart and Delfino quit working at Revere and started developing the D E replacement part for the Gozinta in 1989. Deere terminated its contractual relationship with Revere in July 1990. Revere filed its petition against Deere on August 24, 1993.

Prior to trial, Deere filed a motion for summary judgment, asserting that Revere's claims were barred because they were not filed within three years of March 12, 1989, the date Delfino and Eckart submitted their proposal to Deere and the date they allegedly breached their nondisclosure agreement with Revere. In response to the motion, Revere argued it did not learn that Delfino and Eckart had a

business deal with Deere until 1992. The district court agreed with Revere's argument and overruled Deere's motion. The court did not submit a statute of limitations issue to the jury, but rather relied on its summary judgment ruling. This issue again was raised by Deere in its directed verdict and post trial motions. Deere contends the district court incorrectly decided that Revere's claims were filed in a timely manner.

The applicable period of limitations for claims for tortious interference with a contract under Iowa law is five years. *See* Iowa Code § 614.1(4); *Iowa Coal Min. Co. v. Monroe County,* 555 N.W.2d 418, 437 (Iowa 1996); *Westway Trading Corp.,* 314 N.W.2d at 403. Connecticut's applicable period of limitations on this claim, however, is three years. *See* Conn.Gen.Stat. § 52–577 (1995). In overruling Deere's motion for summary judgment, the court did not articulate whether Iowa or Connecticut law governed the applicable statute of limitations, but simply concluded that Revere had no knowledge of the viability of its claims against Deere until 1992.[5]

Iowa and Connecticut both require that a claim for misappropriation of trade secrets must be brought within three years from the date the misappropriation is discovered or should have been discovered by exercise of reasonable diligence. *See* Iowa Code § 550.8; Conn.Gen.Stat. § 52–577.

Irrespective of whether the Connecticut three-year or Iowa five-year period applies, we agree with the district court's conclusion that Deere presented no evidence that Revere had knowledge, inquiry or otherwise, before 1992 of Delfino and Eckart's business deal with Deere to make a replacement part for the Gozinta. Thus, there was no basis for submitting a statute of limitations issue to the jury. The statute of limitations did not begin to run until 1992. Revere's claims against Deere were

filed in a timely manner because they were filed within at least three years after Revere received knowledge of Delfino and Eckart's business dealing with Deere. We therefore find no error on this issue and affirm.

**VIII. Did the district court properly determine that Deere was not entitled to a pro tanto credit against Revere's damages verdict based on Revere's federal court settlement with Delfino and Eckart?**

In its suit in federal court in Connecticut against Delfino and Eckart, Revere asserted claims for patent and trademark infringement and breach of contract. Revere settled these claims in return for $60,000, secured by a promissory note. The settlement agreement expressly reserved Revere's claims against Deere. Deere contends the district court erred in refusing to apply the pro tanto credit rule to reduce the jury's verdict in this case by the amount of Revere's settlement with Delfino and Eckart. Deere raised this issue as an affirmative defense in its amended answer which it was required to do to preserve the issue. *See Ezzone v. Riccardi,* 525 N.W.2d 388, 401 (Iowa 1994) (applicability of pro tanto credit rule must be pleaded as an affirmative defense). The district court did not articulate its reasoning for refusing to apply the pro tanto credit rule.

We review the trial court's decision on this issue for correction of errors at law. *See Jamieson v. Harrison,* 532 N.W.2d 779, 780 (Iowa 1995) (citing Iowa R.App.P. 4). We have explained the standard concerning the *pro tanto* credit rule as follows:

Under the pro tanto credit rule, we "allow a dollar-for-dollar credit against a plaintiff's ... verdict for sums received

5. In the district court, Deere argued that the issue of whether Delfino and Eckart breached their agreement with Revere would be governed by Connecticut law because that is where Delfino and Eckart were employed.

in settlement from other tortfeasors." ... "All payments in settlement *of a claim*, except payments in the nature of a gratuity or arising from separate contract, fall under this rule which, is designed to prevent the unjust enrichment of a double recovery." ... The burden is on the party seeking to reduce its liability by the settlement amount and must be pleaded as an affirmative defense.... This party must show that "without such a credit the plaintiff would receive more than full compensation for [the] *injuries*."

*Ezzone*, 525 N.W.2d at 401 (emphasis added) (quoting *Knauss v. City of Des Moines*, 357 N.W.2d 573, 578 (Iowa 1984)).

The well-established rule is that a defendant is not entitled to a credit for any settlement amount unless it shows that without such credit, plaintiff would receive more than full compensation for his or her injuries. *Jamieson*, 532 N.W.2d at 782; *Knauss*, 357 N.W.2d at 578. The focus therefore in applying the pro tanto credit rule is on the damages actually sustained and recoverable. *Jamieson*, 532 N.W.2d at 782–83 (concluding that although the district court was incorrect in holding that the pro tanto credit rule was inapplicable, the non-settling defendant was not entitled to a reduction of the judgment entered against him, based on plaintiff's settlement with another tortfeasor, because there was no double recovery if the settlement of $9000 did not exceed plaintiff's damages of $20,000).

Here, Revere asserts that because its federal court suit against Delfino and Eckart involved different claims—trademark and patent infringement and breach of contract—the jury's verdict in this case awarding damages for tortious interference with contract and civil conspiracy does not amount to duplicate recovery. Revere thus contends that the pro tanto credit rule does not apply when different theories of recovery are asserted against

the settling and nonsettling defendants. In other words, Revere would interpret the phrase "all payments in settlement of a claim," *see Ezzone*, 525 N.W.2d at 401, to mean one claim, distinguishable from other types of claims. Under Revere's interpretation, the pro tanto rule would not apply when a plaintiff recovered different measures of damages on different theories of recovery against joint tortfeasors.

Upon our review, we conclude that the district court properly concluded that Deere was not entitled to have the jury's verdict reduced by the $60,000 settlement with Delfino and Eckart. We believe that the damages Revere could recover from Delfino and Eckart for patent and trademark infringement and breach of contract could be different from those recovered in this suit. For instance, in its action against Deere, Revere limited its measure of damages to lost profits from losing its deal with Deere. From Delifino and Eckart, Revere could have recovered (but settled for) such other items of damages as unjust enrichment or expectancy damages reflecting the benefit Revere would have had received from Delfino and Eckart's work and development on the sensor eventually purchased from Deere and associated profits. Thus, while the $60,000 settlement amount could include some damages for lost profits for which Revere recovered in this case, we conclude Deere failed to establish what amount would fairly represent full compensation for the combined injuries sustained by Revere as the result of the actions of Delfino, Eckart and Deere. *Cf. Knauss*, 357 N.W.2d at 578 (noting that plaintiff may have sustained a single injury as a result of negligent acts of two tortfeasors, but damages plaintiff could recover from each were not the same). In fact, Deere presented no evidence whether Delfino and Eckart made any payments to Revere on the promissory note. *See* Restatement (Second) of Torts § 885(3) (1979).[6] As a result, Deere failed

---

**6.** Restatement (Second) of Torts section 885(3) states:

to establish its right to a pro tanto credit. *Cf. Jamieson,* 532 N.W.2d at 783; *Knauss,* 357 N.W.2d at 578; *Zimprich v. Harvestore Sys., Inc.,* 461 N.W.2d 425, 430 (N.D. 1990) (nonsettling defendant was not entitled, under Restatement (Second) of Torts § 885(3) (1979),[7] to a credit for plaintiff's settlement with other party; plaintiff's first suit involved claims for breach of warranty while second suit alleged trespass and conversion; separate claims were thus involved for separate types of harm flowing from defective feed-storage system and from its repossession).

We conclude that the district court correctly refused to grant Deere a pro tanto credit on Revere's federal court settlement with Delfino and Eckart. We find no error on this issue and affirm.

## IX. Revere's cross appeal.

On its cross appeal, plaintiff Revere raises several assignments of error concerning the district court's instructions to the jury on the misappropriation of trade secrets issue.

Instruction No. 18, defined a trade secret as "any formula, pattern, compilation, program, device, method, technique, or process which:

1. Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by persons other than the Plaintiff, and;

2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

The jury was also instructed that in determining whether the hole size and other information constituted a trade secret, it could consider among other things, "[t]he ease or difficulty with which the information could be properly acquired or duplicated by others."

A. Revere's first assignment of error regarding jury instructions is that the district court erred in refusing to instruct the jury, as to the limited scope of a reverse engineering defense.[8] Revere asked the court to instruct the jury that "[t]he fact that one could have obtained a trade secret lawfully is not a defense if one does not actually use proper means to acquire the information." Revere's theory was that Deere could not avoid liability for misappropriation of Revere's trade secrets by asserting that the information was discoverable by reverse engineering or destructive testing because Deere offered no evidence at trial that it in fact used such methods.

■ We conclude that instruction No. 18 adequately stated the law. Instruction No. 18 is essentially a direct quote of Iowa Code section 550.2(4)(a) and (b). Additionally, Deere presented no evidence it performed reverse engineering and thus did not argue it had a defense to liability for *misappropriation* if the jury so found. Rather, Deere's contentions concerning reverse engineering went to the initial question of whether Revere's information related to hole size, hole placement, placement of gauges, production methods, and products costs constituted protectable trade secrets, a prerequisite to finding that Deere misappropriated Revere's trade secrets. We believe that the question of whether Revere's alleged trade secrets could be

---

A payment by any person made in compensation of a claim for a harm for which others are liable as tortfeasors diminishes the claim against the tortfeasors, at least *to the extent of the payment made,* whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment. (Emphasis added.)

**7.** *See* text in note 6.

**8.** "Reverse engineering is the process by which a completed process is systematically broken down into its component parts to discover the properties of the product with the goal of gaining the expertise to reproduce the product." *Christianson v. Colt Indus. Operating Corp.,* 870 F.2d 1292, 1295 n. 4 (7th Cir.1989).

discovered by alternative methods was adequately covered in Instruction No. 18 and we therefore find no error concerning the court's refusal to give Revere's requested jury instruction.

B. Revere's second assignment of error is that the court's instruction regarding the definition of trade secret was too narrow and that the court erred in refusing to include the following language requested by Revere:

Business information may also fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures. Trade secrets can range from customer information, to financial information, to information about manufacturing processes, to the composition of products.

As noted above, instruction No. 18 essentially quotes the definition of trade secret stated in Iowa Code section 550.2(4). We therefore conclude that the court's instruction regarding definition of a trade secret was a correct statement of the law and adequately covered the concepts mentioned in Revere's requested instruction.

C. Revere's third assignment of error is that the district court erred in failing to instruct the jury that "[r]easonable precautions to protect the secrecy of the trade secret will suffice," and that secrecy of the information need not be absolute.

We find no merit to this assignment of error because Instruction No. 18 told the jury that a trade secret "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." As a whole, we conclude that the instructions correctly and adequately stated the law. We find no error on this issue and affirm.

### X. Disposition.

We have considered other contentions made by the parties but find no reversible error in them.

In summary, we conclude (1) that Revere's employment agreement with Delfino and Eckart was an enforceable agreement such that it could be the basis for a claim for tortious interference with a contract; (2) the jury's verdict finding defendant Deere tortiously interfered with Revere's agreement with Delfino and Eckart is supported by substantial evidence; (3) the jury's awards for compensatory damages for tortious interference with contractual relations and civil conspiracy are supported by the evidence; (4) the district court properly instructed the jury regarding Revere's lost profits claim; (5) to avoid duplication, Revere is only entitled to judgment for damages for tortious interference with contract and not for civil conspiracy; (6) the district court properly submitted the issue of punitive damages to the jury; (7) on remand, the district court should hold a hearing concerning the proper distribution of the punitive damage award in accordance with Iowa Code section 668A.1(2)(b) and enter an appropriate modified judgment concerning punitive damages; (8) the district court properly rejected Deere's contention that Revere's claims were barred by the statute of limitations; (9) Deere is not entitled to a pro tanto credit against the jury's award based on Revere's federal court settlement with Delfino and Eckart; and (10) the district court did not err in instructing the jury concerning Revere's claim for misappropriation of trade secrets.

Accordingly, we affirm in part and reverse in part the judgment of the district court and remand for further appropriate proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**