**C PLUS NORTHWEST, INC. and Richard A. Sjogren, Plaintiffs,**

v.

**Ryndert D. DeGROOT, George L. Vermillion, Karleen M. Heselwood, Dvh Transportation, LLC, DVH Logistics, LLC, DVH Leasing, LLC, and DVH Property Holdings, LLC, Defendants.**

**No. 3:06–cv–62.**

United States District Court, S.D. Iowa, Central Division.

Feb. 14, 2008.

---

Michael McDonough, Moyer & Bergman, PLC, Cedar Rapids, IA, Michael McDonough, Moyer & Bergman, PLC, Cedar Rapids, IA, for Plaintiffs.

Thomas D. Waterman, Lane & Waterman, LLP, Davenport, IA, for Defendants.

## ORDER

ROBERT W. PRATT, Chief Judge.

## I. PROCEDURAL BACKGROUND

Trial in the above-captioned case commenced on October 15, 2007. The jury returned a verdict in favor of the Plaintiffs on October 18, 2007. The parties were represented well at trial, and the hard work and professionalism exhibited by counsel for both sides was apparent to the Court, as well as to the jurors. Specifically, the jury made the following findings:

1) On Plaintiffs' claim of Conspiracy in Count I, the jury returned a verdict in favor of C Plus Northwest Inc. ("C Plus") in the amount of $72,000, and in favor of Richard Sjogren ("Sjogren") in the amount of $21,000. The jury further awarded $50,000 in punitive damages to C Plus and $50,000 in punitive damages to Sjogren;

2) On Plaintiffs' claim of Breach of Fiduciary Duty to C Plus in Count II, the jury returned a verdict in favor of C Plus in the amount of $126,000. The jury further awarded $126,000 in punitive damages to C Plus;

3) On Plaintiffs' claim of Misappropriation of Trade Secrets in Count III, the jury returned a verdict in favor of Plaintiffs, but awarded no compensatory or punitive damages to either C Plus or to Sjogren;

4) On Plaintiffs' claim of Intentional Interference with Current Business Relations in Count IV, the jury returned a verdict in favor of C Plus in the amount of $150,000, but awarded zero compensatory damages to Sjogren. The jury further awarded $150,000 to C Plus and $150,000 to Sjogren in punitive damages;

5) On Plaintiffs' claim of Intentional Interference with Prospective Business Relations in Count V, the jury returned a verdict in favor of C Plus in the amount of $100,000 and in favor of Sjogren in the amount of $100,000. The jury further awarded $100,000 in punitive damages to C Plus and $100,000 in punitive damages to Sjogren.

Clerk's No. 76. Presently before the Court is Defendants' Post–Verdict Motion Regarding Entry of Judgment. Clerk's No. 82. Plaintiffs filed a resistance to the motion and Defendants replied. Defendants requested an oral argument on the motion. The Court finds, however, that, as with the trial work of counsel, the writ-

ten briefs are of such a quality as to permit a full resolution of the matter. The Court does not believe that oral argument would substantially aid the Court in its analysis and the matter is, therefore, fully submitted.

## II. FACTUAL BACKGROUND

Plaintiff Rick Sjogren is a transportation broker who has been in the brokerage business for over twenty years. A transportation broker essentially acts as a middleman between customers who need products moved and the trucking companies that have the equipment to move the products. Day One Trial Tr. at 136.[1] In 2003, Sjogren incorporated C Plus in Yakima, Washington. At about that time, Sjogren began negotiations to provide services for a very large account—Pinnacle Foods— and shortly thereafter, hired Karleen Heselwood ("Heselwood") as a bookkeeper for C Plus. Sjogren also began communications with two acquaintances of his, George Vermillion ("Vermillion") and Ryndert DeGroot ("DeGroot"), about the possibility of working together. In 2004, Heselwood was appointed as secretary and treasurer of C Plus and assumed full control of the company's finances. *Id.* at 145. Vermillion was brought on to develop the Pinnacle account and others, and DeGroot was brought in to manage certain trucking aspects of the business. Both Vermillion and DeGroot became Vice Presidents, members of the board of directors, and shareholders of C Plus, eventually holding 12% and 24% of the corporations' shares, respectively. After Heselwood, Vermillion, and DeGroot joined the company, C Plus opened a second operations site in Keokuk, Iowa. Heselwood moved from the Yakima office to join DeGroot and Vermillion in the Iowa office in 2005. At the end of 2005, there developed a rift between the parties, and some discussions were held about dissolving C Plus.[2] According to Sjogren, in January 2006, Vermillion, DeGroot, and Heselwood stopped providing him with financial information about the corporation and began conspiring to transfer C Plus business to the new DVH corporations, incorporated by Heselwood, DeGroot, and Vermillion in January 2006. In early March 2006, the Defendants began openly doing business as the DVH entities, purportedly with many customers, equipment, and property of C Plus.

According to Sjogren, he was, for all practical purposes, left "holding the bag" as to C Plus' liabilities. Many carriers wanted payment and some filed claims against C Plus' bond, exceeding the maximum bond amount.[3] Day One Trial Tr. at 212. Sjogren testified that a "huge balance" of $220,000 to $240,000 in freight bills was left outstanding, and that some checks were returned for insufficient funds because the bank froze C Plus' accounts. *Id.* at 214. In order to protect his reputation and stay in business, Sjogren claims to have personally gone to every entity with an outstanding invoice or that had a check declined for insufficient funds, and personally guaranteed payment. *Id.* Indeed, Sjogren claims to have paid off over $200,000 in C Plus debts using either his own money or using funds from a new company incorporated on January 18, 2006, C Plus

---

1. All references to the Trial Transcript are to the Court's unedited RealTime transcript.

2. Sjogren maintained at trial that there was no real discussion of terminating the parties' relationships with each other or with C Plus. The Defendants, on the other hand, took the position that all parties were working toward winding up the affairs of C Plus.

3. Sjogren testified that federal regulations require that a surety bond in an amount of no less that $10,000 be obtained before an individual may be licensed as a transportation broker. Day One Trial Tr. at 213. The bond is intended "to cover any claims brought by carriers that are deemed the responsibility of a carrier that refuses to pay." *Id.*

NW Transportation, Inc. ("Transportation Inc.").

## III. LAW AND ANALYSIS

Defendants assert several arguments as to why some of the jury verdicts and awards must be set aside. Specifically, Defendants assert the following: 1) several of the jury's awards are duplicative and must be set aside to avoid a double recovery; 2) the awards to Sjogren personally must be set aside in their entirety because the only harm suffered by Sjogren was derivative of harm to C Plus; 3) the jury's award of $0 in actual and punitive damages on the misappropriation of trade secrets claim requires entry of judgment for Defendants on that claim; 4) the jury award on the intentional interference with current business relations claim and the jury award on the intentional interference with prospective business relations claim must be set aside because Plaintiffs failed to prove that the Defendants' predominant purpose was to financially harm or destroy Plaintiffs' business; and 5) the punitive damage award to Sjogren on the intentional interference with current business relations claim must be set aside in light of the jury's award of $0 in compensatory damages. The Court will address each argument in turn.

### A. *Personal Awards to Sjogren*

Defendants argue that the jury's awards in favor of Plaintiff Sjogren individually must be vacated because Sjogren has failed to prove the breach of any independent duty owed to him, and has failed to show that he suffered any compensable injury distinct from other shareholders. Sjogren counters that he provided ample evidence at trial to permit the jury to conclude that he suffered a separate and distinct injury, and that the individual awards in his favor should be sustained.

■ "As a matter of general corporate law, shareholders have no claim for inju-

ries to their corporations by third parties unless within the context of a derivative action." *Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881, 883 (Iowa 1983). "There is, however, a well-recognized exception to the general rule: a shareholder has an individual cause of action if the harm to the corporation also damaged the shareholder in his capacity as an individual rather than as a shareholder." *Id.* Entitlement to the exception can be proved in one of two ways: 1) by demonstrating that some "special duty" was owed to the shareholder; or 2) by showing that injury to the shareholder is "separate and distinct from that suffered by the other shareholders." *Id.* Here, Plaintiff Sjogren claims that he meets the second prong of the exception, i.e., that he suffered an injury separate and distinct from that suffered by the other shareholders. Specifically, Plaintiff asserts that, because of the Defendants' actions, he had to pay off debts owed by C Plus, had to pay the $10,000 surety bond, and suffered harm to his reputation and a resultant loss of business. *See* Pls.' Resistance Br. at 6–7; *see also* Clerk's No. 60 at 1–2.

■ On the facts presented at trial, the Court cannot say that Sjogren suffered a separate and distinct injury, such that he may recover individually. All of Sjogren's claimed individual damages derive exclusively from the damage to C Plus. It was the Defendants' tortious conduct toward C Plus that caused C Plus' corporate debts to remain unpaid. Sjogren's attempts to pay those debts to salvage his own reputation is entirely derivative of the damage to the corporation, as is any actual resultant harm to Sjogren's reputation, even to the extent that a sullied reputation interfered with his ability to profit with his new corporation. Indeed, the Court notes that Sjogren's assertions of personal harm fall within the type of claim typically the subject of only a derivative action:

Without identifying it as such, other courts and commentators follow a categorical approach in distinguishing between individual and derivative shareholder actions. Essentially, this approach relies on stare decisis, but may also expand prior precedent by identifying an action as the "kind of action" that is appropriately brought either derivatively or individually. Either way, this approach generates or recognizes one set of actions which give rise to individual suits and another set giving rise to derivative suits. How a given action is classified may vary from one jurisdiction to another.

As such, the following actions are frequently mentioned as being, by definition, actionable only derivatively: actions for mismanagement of the corporation; *suits against directors for misfeasance or misappropriation of corporate property;* actions for the enforcement of corporate contracts with third parties; *actions against corporate directors for competing with the corporation;* suits alleging that corporate officers received excessive salaries; third party torts against the corporation; and actions to correct false entries by directors in the records of the corporation.

Other types of actions are frequently classified as those which are, per se, appropriate subjects for individual suits: suits alleging oppression, harassment, or fraud against shareholders; actions for the denial of fundamental participation in the affairs of the corporation or of a fair return on investment; actions for the deprivation of voting rights or rights to examine corporate books and records; suits alleging that the granting of stock options or selling of stock was intended to dilute the remaining shareholders' proportionate interest in the corpora-

tion; actions on the corporation's refusal to issue a stock certificate or to convert stock from restricted to non-restricted stock; and actions alleging that the corporation or its officers impaired the shareholder's proprietary rights or fraudulently induced the shareholders to sell stock.

John W. Welch, *Shareholder Individual and Derivative Actions: Underlying Rationales and the Closely Held Corporation,* 9 J. Corp. Law 147, 157–58 (Winter 1984) (emphasis added) (cited with approval in *Redeker v. Litt,* No. 04–0637, 2005 WL 1224697 (Iowa Ct.App. May 25, 2005)).

Furthermore, the fact that Sjogren suffered monetary damage, to the extent that he personally, or through Transportation, Inc., paid debts and the $10,000 surety bond, cannot give rise to an individual right of action. First, to the extent that Sjogren claims that he was a "guarantor" of C Plus' debts, particularly of the $10,000 bond, this does not warrant permitting him to obtain an individual recovery. The Iowa Supreme Court has specifically rejected the argument that an exception to the general rule of corporate law can be found when a shareholder guarantees a corporate obligation. *See Engstrand v. W. Des Moines State Bank,* 516 N.W.2d 797, 800 (Iowa 1994) (citing *Nicholson v. Ash,* 800 P.2d 1352, 1356 (Colo.Ct.App.1990) ("If damages to a shareholder result indirectly, as the result of an injury to the corporation, and not directly, the shareholder cannot sue as an individual.")).

In Final Instruction No. 16, the Court instructed the jury that it could "not award damages to compensate for payments by a person or entity that is not a party in this lawsuit" and that it could not "award damages to compensate for payments a party made voluntarily without a contractual or legal obligation." This instruction is entirely consistent with the rule in *Engstrand,* as it is counterintuitive

to think that a party who is legally obligated to pay a corporate debt as a guarantor cannot recover individually for his loss, but that a party who is not legally obligated to pay a corporate debt can. The evidence presented at trial and the arguments of the parties make clear that Sjogren undertook to pay C Plus' debts to preserve his own reputation and out of a sense of moral obligation. The fact remains, however, that neither Sjogren nor Transportation Inc. had any legal obligation to pay C Plus' debts, and that neither can recover individually as a result.

Additionally, it is worth pointing out that the vast majority of C Plus' debt was paid by Transportation Inc., and not by Sjogren directly. Exhibit 20, introduced at trial, showed that nearly $180,000 of C Plus' "trade debt" (payments that Sjogren testified were made to entities that had outstanding invoices or had C Plus checks declined for insufficient funds) was paid by Transportation Inc. Transportation Inc. is Sjogren's corporation exclusively, and has no connection or ties with C Plus. No contract existed between Transportation Inc. and C Plus making Transportation Inc. responsible for any of C Plus' debts, and no payment of the debt by Transportation Inc. was ever formally routed through C Plus as a loan from one corporation to another. Indeed, while Sjogren may have considered the funds a loan from Transportation Inc. to C Plus, he simply did not structure the transactions that way legally. Interestingly, even were the Court to accept Sjogren's proposition that Transportation Inc. should be compensated for amounts it paid on C Plus' behalf, such a recovery would be barred in the present action because Transportation Inc. is not a party to the present lawsuit. Though Sjogren is Transportation Inc.'s sole shareholder, Sjogren has not presented any theory on which the Court could ignore Transportation Inc.'s legal status as the actual party to whom such funds would be owed, and instead award those funds to Sjogren.

The only possible ground on which Sjogren could realistically claim individual damages is to the extent he claims his personal reputation was injured, which in turn led to a loss of business. This harm, however, does not constitute an injury that is "separate and distinct" from injuries to other shareholders. To qualify as an exception to the general rule that shareholders may not bring suit individually, Sjogren must show that his "injury is separate and distinct to [him,] the suing shareholder[,] and not generally injuring all shareholders." *Ezzone v. Riccardi*, 525 N.W.2d 388, 395 (Iowa 1994). "The fact that the plaintiff was the majority shareholder ... is irrelevant" in this inquiry. *Cunningham*, 332 N.W.2d at 883. Here, the harm to Plaintiff's reputation was derivative of the harm to the corporation, i.e., due to the tortious conduct of the Defendants, C Plus was unable to pay its debts, and Sjogren's reputation was hurt as a result. This harm to Sjogren, however, is not distinct from the harm that derivatively befell the other shareholders as well. Every shareholder, not just Plaintiff, could and likely did have their reputation injured by C Plus' inability or failure to pay its debts. Plaintiff appears to argue that because Heselwood, Vermillion, and DeGroot were the cause of the harm to the corporation, the fact that they may have suffered harm to their own reputations is somehow distinguishable. Plaintiff offers no case law in support of this proposition, however. Furthermore, evidence at trial revealed that there was at least one other shareholder (other than the four shareholders who are parties to the present action) [4] in C Plus, who may well have suffered injury to her reputation.

---

4. Sjogren testified that Marianne Reynolds became a 6% shareholder in C Plus. Day One

Finally, to the extent that Plaintiffs argue that the jury implicitly found that Sjogren suffered an independent injury, the Court must disagree. Plaintiff urges that the jury's verdict, combined with the fact that the Court instructed the jury not to award any damages to individuals for harms suffered by the corporation, gives rise to an inference that Sjogren suffered "separate and distinct" injuries. The fact that the jury found that Sjogren suffered an injury "separate and distinct" from the injuries of the corporation, however, does not satisfy the legal requirement that he demonstrate that he suffered an injury separate and distinct *from other shareholders,* such that he is entitled to individual remedies in the first instance.

Having found that Sjogren has no individual cause of action under the traditional rules, the Court now must turn to the question of whether the analysis differs given that this case arises in the context of a closely held corporation. Iowa courts have acknowledged that the strict adherence to corporate law rules are not necessarily the best approach when closely held corporations are involved:

> A close corporation is "[a] corporation whose stock is not freely traded and is held by only a few shareholders. . . ." Black's Law Dictionary 365 (8th ed.2004). If a closely held corporation operates more like a partnership, some jurisdictions allow the shareholders to bring an individual action, even though the cause of action may technically be that of the corporation. *See* 19 Am. Jur.2d Corporations § 1941, at 129 (2004). *See also* Welch, 9 J. Corp. L. at 170. The reasoning behind allowing shareholders in a closely held corporation to bring suit individually stems from the fact the shareholders of this type of corporation have very direct obligations to one another. *See Holden v. Con-*

Trial Tr. at 149.

*struction Mach. Co.,* 202 N.W.2d 348, 358 (Iowa 1972) ("[O]fficers and directors of a corporate entity, particularly management controlling directors of closely held corporations[,] occupy a fiduciary, or at least a quasi-fiduciary duty as to the corporation and its stockholders."); *see also Holi–Rest Inc. v. Treloar,* 217 N.W.2d 517, 524 (Iowa 1974). Further, the policy reasons for imposing the institution of a derivative suit in cases involving publicly held corporations tend to be absent in suits involving close corporations due to the close identity between shareholders and managers. *See* Welch, 9 J. Corp. L. at 170. *See generally* American Law Institute, *Principles of Corporate Governance: Analysis and Recommendations* § 7.01(d) (1994) (hereinafter ALI, Corporate Governance). Other courts, under the "separate and distinct" injury theory, point out the suing shareholder, usually the minority shareholder, is often the only shareholder injured, and thus permit that shareholder to file individually. *See, e.g., In re Estate of Ziehm,* 79 Misc.2d 467, 360 N.Y.S.2d 391, 393 (1974).

In contrast, other jurisdictions require absolute adherence to the requirement of filing a derivative suit even in cases involving shareholders of a close corporation. 19 Am.Jur.2d Corporations § 1941, at 129. These courts acknowledge the principles giving rise to the rule requiring derivative actions are sometimes present even in litigation concerning closely held corporations. *See* Welch, 9 J. Corp. Law at 183 (noting derivative recovery provides protection to creditors of a corporate entity); *see also Barth v. Barth,* 659 N.E.2d 559, 562 (Ind.1995). In light of these competing theories, the American Law Institute

(ALI) recommends a discretionary approach, allowing trial courts to entertain suits filed by shareholders in their individual capacity only when the policy reasons for imposing the requirement of a derivative action are absent. In its corporate governance publication, the ALI provides as follows:

> In the case of a closely held corporation, the court in its discretion may treat an action raising derivative claims as a direct action ... if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

ALI, Corporate Governance § 701(d).

*Redeker*, 2005 WL 1224697, at *5–6.

 As *Redeker* makes clear, the determination of whether to apply an exception for closely held corporations is discretionary with the trial court, after fair consideration of the ALI factors. On the present facts, the Court cannot conclude that principles of equity require Sjogren to be permitted to recover individually, despite the fact that this case arises in the context of a closely held corporation. The record established at trial demonstrates that the second ALI factor is at issue in this case, that is, were the Court to permit Sjogren to recover individually, or to recover individually on behalf of the corporation, the interests of creditors of C Plus could be materially prejudiced. Moreover, as the Court has previously discussed, all of Sjogren's individual harm is derivative of the corporate harm. To permit Sjogren to recover individually would constitute an impermissible double recovery in light of the fact that the jury awarded the corporation damages for the same harms.[5]

### B. *Counts IV and V—Proof of Predominant Purpose*

Defendants argue that the claims in Counts IV and V, intentional interference with current business relations and intentional interference with prospective business relations, fail as a matter of law because Plaintiffs failed to prove that the Defendants' predominant purpose was to financially harm or destroy Plaintiffs' busi-

---

**5.** The Court notes that it would strike the punitive damages awarded in Sjogren's favor on Count IV even if Sjogren's individual claims could stand. On Plaintiffs' Count IV, the jury found in favor of Plaintiffs and awarded C Plus $150,000 in compensatory damages and $150,000 in punitive damages. The jury further awarded $0 in compensatory damages and $150,000 in punitive damages to Sjogren. Defendants argue that the punitive damage award in favor of Sjogren must be vacated in light of the jury's failure to award compensatory damages. Plaintiffs did not resist Defendants' motion in this regard. *See* Pls.' Resistance Br. at 2 (conceding that the punitive damage award to Plaintiff Sjogren on Count IV must be vacated).

"Some actual damages must be shown to support a claim for punitive damages." *Schlegel v. Ottumwa Courier, A Division of Lee Enterprises Inc.*, 585 N.W.2d 217, 226 (Iowa 1998) (citing *Sundholm v. City of Bettendorf*, 389 N.W.2d 849, 853 (Iowa 1986)). Actual damages need not be shown by a large compensatory jury award, but rather can be established via a jury award of nominal damages. *See Hockenberg Equip Co. v. Hockenberg's Equip. & Supply Co.*, 510 N.W.2d 153, 156 (Iowa 1993) ("An award of actual damages, however, is not necessary to support an award of punitive damages. The plaintiff need only show that the defendant actually caused plaintiff some injury to sustain a verdict for nominal compensatory damages (for example, one dollar) and punitive damages.") (citing *Sundholm*, 389 N.W.2d at 853, other citations omitted). In this case, the jury awarded no damages in any form, compensatory, actual, or nominal, to Sjogren. Accordingly, the punitive damage award in favor of Sjogren cannot stand.

ness. Plaintiffs counter that Defendants' argument goes to the sufficiency of the evidence, and that when viewed in the light most favorable to the jury's verdict, the evidence was ample to support a finding that Defendants' predominant purpose was to financially injure or destroy Plaintiffs' business.

■ In Final Instructions Nos. 11–12, the Court instructed the jury that to return a verdict in favor of Plaintiffs, it must conclude, amongst other things, that Defendants "intentionally and improperly interfered" with Plaintiffs' current and/or future business relationships. The Court defined the terms "intentional" and "improper" as follows:

A party's interference with a current business relationship is intentional if the party either interferes with the current business relationship on purpose or knows the conduct is substantially certain to interfere with the current business relationship. A party's interference with a current business relationship is improper if the party's interference is done with the predominant purpose of financially harming or destroying the opposing party's business.

Final Instruction Nos. 11–12. The Court's instructions are consistent with Iowa law on the topic, in that the "predominant purpose" test is applicable to situations such as the present one, where one claim is for prospective business relations and the other claim pertains to contracts between C Plus and carriers that were terminable at will. *See Compiano v. Hawkeye Bank & Trust of Des Moines,* 588 N.W.2d 462, 464 (Iowa 1999) (stating that "to recover for interference with prospective business relations, a plaintiff must prove the defendant acted with the sole or predominant purpose to injure or financially destroy the plaintiff," and further finding that allegations of interference with an existing contract should be treated in the same way when the existing contractual relations are terminable at will).

■ To sustain the jury's verdicts on Counts IV and V, there must be substantial evidence in the record which would permit a conclusion that "the sole or predominant purpose of the actor's conduct was to financially injure or destroy the plaintiff." *Willey v. Riley,* 541 N.W.2d 521, 526–27 (Iowa 1995). "If a defendant acts for two or more purposes, his improper purpose must predominate in order to create liability." *Id.* at 527 (citations omitted). "The substantial evidence rule in Iowa requires that the circumstances have 'sufficient probative force to constitute the basis for a legal inference, and not for mere speculation.'" *Id.* (quoting *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 800 (Iowa 1984)). "The element of improper purpose focuses on [the Defendants'] motivation to interfere with [Plaintiffs'] business relationships." *Lake Panorama Serv. Corp. v. Cent. Iowa Energy Coop.,* No. 98–2276, 2001 WL 1014805, at \*4 (Iowa Sept. 6, 2001); *see also Nesler v. Fisher & Co.,* 452 N.W.2d 191, 197–98 (Iowa 1990) (noting that the focus of improper interference is on the purpose in acting, rather than the fact of the act itself). Thus, "if the interference is a necessary consequence of actions taken for a different purpose, the acts may be deemed intentional, but are not improper." *Lake Panorama,* 2001 WL 1014805, at \*4.

■ Plaintiffs argue, quite perfunctorily, that the evidence at trial showed that Defendants presented bills to customers on altered invoices to divert funds and accounts to their own DVH corporations. This is substantial evidence, according to Plaintiffs, of Defendants' improper motive. The Court agrees with Plaintiffs' ultimate conclusion when viewing the record as a whole. Not only did Defendants book loads in the name of C Plus and then

divert payment to their new DVH entities, Defendants also took all of C Plus' property out of the Keokuk office, making it impossible for C Plus to continue business at that location. Furthermore, Defendants took funds out of C Plus accounts, failed to keep appropriate business records that would permit a fair accounting of all the activity that happened in the Keokuk office, and made no effort to legitimately wind up C Plus' affairs before moving on with their own interests. This information, which apparently was believed by the jury, was certainly substantial enough to give rise to an inference that Defendants' actions were not only intentional, but that they were improper as well. While it is certainly reasonable to think that Defendants diverted business and assets from C Plus to further their own business ventures, this does not preclude a finding that the methods used were almost certain to result in the destruction of C Plus. Indeed, the evidence was more than ample to permit the jury to draw such a conclusion without resort to speculation. *See Willey,* 541 N.W.2d at 527 (citations omitted). Furthermore, determining the "intention" and the "predominant purpose," as required by instructions 11 and 12, is uniquely a duty that the law leaves to the jury. Where, as here, there is conflicting evidence as to both intention and predominant purpose, the jury's verdict should be upheld. *See, e.g., Tredrea v. Anesthesia & Analgesia, P. C.,* 584 N.W.2d 276, 284 (Iowa 1998) (finding that where substantial evidence existed to permit the jury to infer an improper motive, the ultimate determination of the issue was for the jury); *Iowa Coal Mining Co., Inc. v. Monroe County,* 555 N.W.2d 418, 440 (Iowa 1996) (finding sufficient evidence existed to general a jury question on "predominant purpose").

## C. *Count III—Misappropriation of Trade Secrets*

On Plaintiffs' Count III, Misappropriation of Trade Secrets, the jury found in favor of Plaintiffs C Plus and Sjogren, but awarded zero compensatory damages and zero punitive damages. During trial, the Court dismissed Plaintiffs' claims for preliminary and permanent injunctions as to all claims. Defendants urge that judgment must be entered in their favor on Count III, because Plaintiffs have failed to show damages of any sort, as evidenced by the jury's verdict. Plaintiffs do not address Defendants' argument regarding Count III in their brief in resistance to Defendants' present motion.[6]

Here, the jury was instructed that to find for Plaintiffs on Count III, it must find that Plaintiffs proved by a preponderance of the evidence "the nature and extent of damage." Final Instruction No. 10. The jury was further instructed: "If the Plaintiffs have proved all [four elements of the misappropriation of trade secrets claim], the Plaintiffs are entitled to damages in some amount." The jury's failure to award any damages whatsoever on this claim is inconsistent with the Court's instruction. Indeed, a damage award of zero indicates that, while the jury may have believed that the Defendants misappropriated trade secrets, the jury did not believe that Plaintiffs suffered any harm as a result. Such a conclusion mandates a verdict in favor of Defendants on Count III, in accordance with the Court's instruction. *See Garcia v. Menard, Inc.,* No. 03–1127, 2004 WL 1854175, at *2 (Iowa Ct. App. July 14, 2004) ("Verdicts that cannot be reconciled 'in any reasonable manner consistent with the evidence and its fair inferences, and in light of the instructions of the court' must be set aside." (quoting

---

**6.** Plaintiffs' failure to resist this portion of Defendants' motion alone constitutes a basis to grant the relief requested, i.e., to enter judgment in favor of Defendants on Count III.

*Hoffman v. Nat'l Med. Enter., Inc.*, 442 N.W.2d 123, 126–27 (Iowa 1989))).

### D. *Duplicative Awards*

■■■■ Defendants contend that Plaintiffs' Count I, conspiracy, is by definition duplicative of all other claims raised by Plaintiffs. Plaintiffs counter that the jury allocated damages in a consistent manner and kept within the overall range of damages evidence presented at trial. "A 'successful plaintiff is entitled to one, but only one, full recovery, no matter how many theories support entitlement.'" *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 770 (Iowa 1999) (quoting *205 Corp. v. Brandow*, 517 N.W.2d 548, 551 (Iowa 1994) (other citations omitted)). "The purpose of compensatory damages is to return an injured party to the party's original position." *Lara v. Thomas*, 512 N.W.2d 777, 783 (Iowa 1994) (citing *Team Cent., Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 925 (Iowa 1978)). "[D]uplicate recovery or overlapping damages are to be avoided." *Id.* (citations omitted).

Plaintiffs cite several cases in support of the proposition that the damages awarded are not duplicative, so long as they are within the boundaries of the overall damages proved at trial when totaled. In *Tavaglione v. Billings*, 4 Cal.4th 1150, 17 Cal.Rptr.2d 608, 847 P.2d 574 (1993), the plaintiff sued the defendant under seven different theories of recovery. The appellate court found that "where separate items of compensable damage are shown by distinct and independent evidence, the Plaintiff is entitled to recover the entire amount of his damages, whether that amount is expressed by the jury in a single verdict or multiple verdicts referring to different claims or legal theories." *Tavaglione*, 17 Cal.Rptr.2d 608, 847 P.2d at 580. Likewise, in *Hunter v. Board of Trustees of Broadlawns Medical Center*, 481 N.W.2d 510 (Iowa 1992), the Iowa Supreme Court found that there was no duplication of damages where it appeared that the jury allocated 75% of the damages to the plaintiff's breach of contract claim and the remaining 25% to a tortious interference with contractual relations claim. *Hunter*, 481 N.W.2d at 518–19. The court stated that "so long as the sum of the awards under the two causes of action does not exceed the total monetary harm suffered by [the plaintiff], a claim of duplicative damage awards is not tenable." *Id.* at 519. And in *EFCO v. Symons Corp.*, 219 F.3d 734 (8th Cir.2000), the jury returned a verdict awarding $13 million for false advertising, $12.3 million for violation of the Iowa Uniform Trade Secrets Act, and $9.7 million for interference with prospective business relations. 219 F.3d at 742. The district court reduced the total award to $13 million, finding that the amount "reache[d] the outer limit of what EFCO proved were its commercial injuries and damages on all its theories." *Id.* (quoting district court order). The Eighth Circuit Court of Appeals affirmed the district court, finding that the "award adequately reflects the damages proved by EFCO." *Id.*

Two Iowa cases decided after *Tavaglione* and *Hunter*, however, call into question the present day propriety of permitting otherwise potentially duplicative damages to stand merely because the overall damages award falls within the total damages claimed at trial.[7] In *205 Corp. v. Brandow*, 517 N.W.2d 548 (Iowa 1994), 205 Corporation sued Mustards restaurant after a former manager of a 205 Corporation restaurant provided secret recipes to Mustards. 517 N.W.2d at 549. The jury returned verdicts in favor of 205 Corporation on claims of misappropriation

---

**7.** While *EFCO* was decided after both *205 Corporation* and *Revere Transducers*, *EFCO* is persuasive, rather than binding, authority in the present diversity case.

of trade secrets and inducement of breach of duty of loyalty. *Id.* Mustards appealed, arguing that 205 Corporation's recovery on the misappropriation of trade secrets claim was duplicative of its recovery on the inducement of breach of duty claim. *Id.* at 551. Reiterating that plaintiffs are entitled to only one full recovery, regardless of how many theories are presented, the Iowa Supreme Court found that the two claims were alternate theories of recovery and that the lesser of the two awards was therefore duplicative of the larger of the two awards. *Id.* In reaching this conclusion, the court pointed out that "the identical injuries were claimed under each theory." *Id.*

Five years later, the Iowa Supreme Court decided *Revere Transducers,* 595 N.W.2d at 751. In *Revere Transducers,* Revere claimed that two former employees violated their employment agreement to start a company that would sell devices to Deere & Co., which devices would replace similar ones that Revere was already manufacturing and selling to Deere. 595 N.W.2d at 755. A jury returned verdicts of $350,000 on Revere's claim of tortious interference with contractual relations and $200,000 on Revere's claim of civil conspiracy. *Id.* Finding the damages duplicative in spite of expert testimony revealing overall damages of approximately $800,000, the court pointed out that, while Revere alleged distinct theories of recovery, "only one type of damage was submitted to the jury—lost profits." *Id.* at 770. Relying on *205 Corp.* and *Team Central,* the court remanded the case for entry of judgment on the tortious interference claim only. *Id.* at 771.

Having already found that a verdict in favor of Defendants is proper on Count III, the question remaining is whether any or all of Counts I, II, IV and V are duplicative. In Count I, Plaintiffs alleged that Defendants conspired to injure Plaintiffs by "misappropriating Plaintiffs' business, corporate opportunities, and trade secrets in violation of their fiduciary duties." Final Instruction No. 5. In Count II, Plaintiffs claimed that Defendants breached their fiduciary duties to Plaintiffs, proximately causing damage. Final Instruction No. 6. In Count IV, Plaintiffs alleged that C Plus had business relationships with various entities and that Defendants interfered with those relationships by conspiring to, and by actually misappropriating, Plaintiffs' business and corporate opportunities, by providing Plaintiffs' customers with brokerage products or services in direct competition with C Plus while employed by C Plus, and that Defendants used Plaintiffs' business assets, records, data, and information to achieve the interference. Final Instruction No. 11. And in Count V, Plaintiffs contended that they had prospective business relations with various entities, and that Defendants intentionally and improperly interfered with those prospective relationships by conspiring to, and by actually misappropriating, Plaintiffs' business and corporate opportunities, by providing Plaintiffs' customers with brokerage products or services in direct competition with C Plus while employed by C Plus, and that Defendants used Plaintiffs' business assets, records, data, and information to achieve the interference. Final Instruction No. 12.

▮▮▮▮▮ Upon review of the trial transcript, the Amended Complaint, and the Jury Instructions in this matter, the Court finds that the damages awarded in Count I are duplicative of the other awards, but that the damages awarded in Counts II, IV and V are not. In Plaintiffs' Amended Complaint, the breach of fiduciary claim (Count II) alleged that Defendants breached their fiduciary duties by diverting present and future business of C Plus to their DVH companies. The breach of fiduciary

duty claim also alleges, however, that Defendants breached their fiduciary duties to C Plus by converting assets of C Plus to their own use. Thus, the jury could have awarded damages for diverted current business, diverted future business, and/or misappropriated assets under this count. In Count IV, Plaintiffs alleged that Defendants "stole" current business contracts of C Plus by sending out DVH invoices for jobs that were signed for in C Plus' name, justifying an award of damages for diverted current business. In Count V, Plaintiffs presented evidence that business relationships with many entities could have continued into the future, had Defendants not improperly interfered, justifying damages for future diverted business.[8] While the current and future diversions of business *could* have been accounted for in breach of fiduciary claim, the Court must presume, absent evidence to the contrary, that the jury followed Final Instruction No. 16 and did not award damages under Count II that it also awarded under Counts IV and V. *See* Final Instruction No. 16 ("You may not award duplicative damages."). Since the jury reasonably could have awarded the damages that it did on Count II strictly on the basis of diverted assets,[9] there is no apparent overlap in the damages awarded under Counts II, IV, and V. As noted, however, the conspiracy claim in Count I is duplicative. That claim asserted damages for the misappropriation of business and corporate opportunities and trade secrets. Here, the basis of the claim (breach of fiduciary duties) overlaps with the basis for the claims in Counts II, IV, and V, as do the claimed damages, that is, the lost business opportunities are appropriately compensated under Counts IV and V, and any other breaches of fiduciary duty are presumably encompassed in Count II. Damages asserted for misappropriation of trade secrets, while technically an independent measure of damages, were apparently rejected by the jury when it opted to award zero damages on the Plaintiffs' misappropriation of trade secrets claim in Count III.

## IV. CONCLUSION

For the reasons stated herein, the Court affirms the entry of judgment in favor of C Plus as to Counts II, IV, and V. Judgment in favor of Defendants shall be entered on Count III. The judgment in favor of C Plus on Count I shall be set aside, as shall all individual awards to Sjogren on all counts. Satisfaction of judgment shall be made to C Plus Northwest Inc., and not to Sjogren individually.

IT IS SO ORDERED.

---

8. While Counts IV and V did allege that Defendants used Plaintiffs' converted assets to achieve the interference, any damages awarded under these Counts, by their plain language, would be for the interference with business relations, and not for the conversion of property, i.e., the conversion of property was referenced merely as one of the means to the end of interference.

9. The jury awarded $126,000 in compensatory damages on the breach of fiduciary duty claim. Plaintiffs presented evidence that Defendants made wrongful withdrawals of $36,000, $23,700, and $38,077.74 (totaling $97,777.74). Plaintiffs also presented evidence that Defendants "made off" with all of the physical assets of C Plus, such as computers, desks, and office equipment.