**KEOKUK GLYCERIN, LLC and John Rothgeb, Plaintiffs,**

**v.**

**MIDWEST LABORATORIES, INC., Defendant.**

**No. 3:14–cv–00111–JAJ–HCA**

United States District Court, S.D. Iowa, Central Division.

Signed 03/10/2016

Brian Andrew Melhus, William J. Miller, Dorsey & Whitney LLP, Des Moines, IA, for Plaintiffs.

Brian J. Brislen, Pro Hac Vice; Sean A. Minahan, Lamson Dugan & Murray LLP, Omaha, NE, for Defendant.

## ORDER

JOHN A. JARVEY, Chief Judge
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

Keokuk Glycerin, LLC, is a glycerin refinement company partially owned and managed by John Rothgeb. In 2009, Keokuk planned to sell its operation to Green-Man Technologies. Before that deal could close, Keokuk had to produce 15,000 gallons of industrial grade glycerin. Glycerin must be at least 95% pure and meet several other quality standards to be industrial grade. Keokuk tracked the purity of its glycerin by sending Midwest Laboratories, Inc., samples for testing. On July 17, 2009, Midwest incorrectly reported that Keokuk's glycerin was only 62% pure. Green-Man subsequently walked away from the deal, and Keokuk and Mr. Rothgeb sued

Midwest, alleging breach of contract and negligent misrepresentation.

Midwest now moves for summary judgment, arguing that Mr. Rothgeb has no individual right to maintain a suit, that Keokuk did not justifiably rely on its report, that its error did not cause Keokuk's harm, and that in fact Keokuk did not suffer damages. Keokuk and Mr. Rothgeb resist the motion.

## I. LEGAL STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *HDC Medical, Inc. v. Minntech Corp.*, 474 F.3d 543, 546 (8th Cir. 2007). But the nonmoving party may not rest on its pleadings; it must cite materials in the record showing there is a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); *Mosby v. Dolphin*, 998 F.2d 1018, 1 (8th Cir. 1993). An issue is genuine if the evidence would allow a reasonable jury to rule for the nonmoving party, and it is material if, under the governing law, it might affect the suit's outcome. *Great Plains Real Estate Development, L.L.C. v. Union Central Life Ins. Co.*, 536 F.3d 939, 944 (8th Cir. 2008); *Saffels v. Rice*, 40 F.3d 1546, 1550 (8th Cir. 1994).

## II. FACTUAL BACKGROUND

In December 2007, John Rothgeb and other investors founded Keokuk Glycerin, LLC. They intended to refine crude glycerin into industrial-grade glycerin, and in early 2008 began constructing a refinement plant. Mr. Rothgeb served as the company's CEO, and hired Ms. Laurie Scott, a chemist, to design the refinement process and run the plant. While Keokuk operated the plant, it never turned a profit. Despite that difficulty, the operation was appraised in March 2009 and valued at between $3.74 million and $4.5 million. The following month, Keokuk signed a Letter of Intent with GreenMan Technologies, Inc. The Letter outlined a plan to sell Keokuk's refinement operation to GreenMan in exchange for $1.35 million and a 10% stake in a new company, set up to run the refinement business. At the time, the parties appear to have valued the 10% stake at $150,000, bringing the purchase price to $1.5 million.[1] Its actual value is now hotly contested.

The Letter conditioned the sale on Keokuk producing 15,000 gallons of "acceptable and saleable industrial grade glycerin." That standard required the refined glycerin to be at least 95% pure, and capped contaminant quantities: the refined glycerin had to, for example, be less than 1% water. Keokuk engaged Midwest Laboratories, Inc., to test its glycerin for compliance with those standards.

Midwest tested ten samples for Keokuk during May, June, and early July. No sample met all of the conditions of closing, although they steadily improved: the glycerin was 75.7% pure and 6.5% water on May 15th, but reached 93.2% purity and 1.5% water content as of June 26th. Meanwhile, GreenMan discussed, both with Keokuk and internally, options for improving the process or for waiving the closing conditions, possibly in exchange for a purchase price reduction. GreenMan's CEO, Mr. Lyle Jensen, testified that as long as

---

**1.** Despite the Letter's text, the parties' briefing often characterizes the Letter as offering a $1.5 million payment and a 10% stake in the new company. In the interest of understanding the facts in the light most favorable to the non-moving party, the Court treats the GreenMan purchase price as consisting of a $1.35 million payment and a 10% stake which the parties valued at $150,000, but which was potentially worth more.

the glycerin purity stayed "in the 90s" GreenMan's Board believed Keokuk could eventually fulfill the Letter's conditions. But on July 17th, Midwest reported glycerin purity of 61.6% and 62.4% to Keokuk. Mr. Jenson received those results from Mr. Rothgeb, and describes GreenMan's reaction as "enough is enough, this is too far off the 95 percent to ... move forward." Shortly afterward, GreenMan walked away from the transaction.

About a week and a half later, Midwest contacted Keokuk again: the July 17th results had been mistaken. The correct numbers were 87.4% and 90.3%. But negotiations with GreenMan did not resume; Keokuk was ultimately sold to a different buyer in exchange for a promise of an equity interest in that company. That sale soured. The details are not clear from the record, but Keokuk evidently never received that equity interest.

Keokuk and Mr. Rothgeb filed suit against Midwest in Iowa state court, alleging that Midwest had breached a contractual duty and committed the tort of negligent misrepresentation. Midwest removed the case to this Court, and moved for summary judgment.

### III. ANALYSIS

Midwest makes four arguments for partial or complete summary judgment. First, it argues that Mr. Rothgeb has no individual right to recover. Second, it argues that Keokuk's reliance on its report was unjustified or negligent. Third, it contends that its mistake did not cause Keokuk's damages. Finally, it asserts that Keokuk did not suffer damages. The Court will address those arguments in turn.

2. Plaintiffs' Resistance characterizes the money as an "advance," possibly implying that Mr. Rothgeb relied on Midwest's representations in deciding to advance the money. But

### A. Mr. Rothgeb's Rights

Generally, "shareholders have no claim for injuries to their corporations by third parties." *Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881, 883 (Iowa 1983). "There is, however, a well-recognized exception to the general rule: a shareholder has an individual cause of action if the harm to the corporation also damaged the shareholder in his capacity as an individual." *Id.* The exception applies if either: 1) the shareholder was owed a "special duty"; or 2) his injury was "separate and distinct from that suffered by the other shareholders." *Id.* Actions to enforce the corporation's contracts and tort actions "are frequently mentioned as being, by definition, actionable only derivatively." *C. Plus Northwest, Inc. v. DeGroot*, 534 F.Supp.2d 937, 942 (S.D. Iowa 2008).

This case is no exception to the general rule. Mr. Rothgeb has two theories of individual injury: he argues that he invested in Keokuk[2] and lost that money, and that Midwest marketed its services to him and negotiated with him. If Mr. Rothgeb lost money, he lost it because Keokuk lost money; his damages "derive exclusively from the damage" Midwest caused Keokuk. *Id.* at 941. And he negotiated with Midwest in his capacity as Keokuk's manager. When an agent contracts on behalf of a disclosed principal, the contract obligates the third party to the principal, not to the agent. Restatement (Third) Of Agency § 6.01 (2006). Mr. Rothgeb has no individual right of action, and summary judgment is granted against his claims.

### B. Keokuk's Reliance

Negligent misrepresentation claims only succeed if the plaintiff justifi-

the cited deposition testimony does not support either the characterization or the implication.

ably relied on the defendant's representation. *Bradshaw v. Wakonda Club,* 476 N.W.2d 743, 747 (Iowa Ct. App. 1991). Reliance is justifiable "if a person acting with reasonable and ordinary prudence and caution would have a right to rely on the representations." *Kaiser Agr. Chemicals v. Ottumwa Production Credit Ass'n,* 428 N.W.2d 681, 683 (Iowa Ct. App. 1988). It is not justifiable if "the person receiving the information knows or . . . should know that the information is false." *Boone County Community Credit Union v. Masel,* 665 N.W.2d 440, 3 (Iowa Ct. App. 2003). "[T]he standard requires plaintiffs to utilize their abilities to observe the obvious, and the entire context of the transaction is considered to determine if the justifiable-reliance element is met." *Union County, IA v. Piper Jaffray & Co., Inc.,* 741 F.Supp.2d 1064, 1112 (S.D. Iowa 2010). Even if Keokuk proves that element of its case, Midwest could still prevail by showing that Keokuk was contributorily negligent. Restatement (Second) of Torts § 552A (1977); *Cedar Falls Bldg. Center, Inc. v. Vietor,* 365 N.W.2d 635, 639 (Iowa Ct. App. 1985).

▪ Midwest argues that Keokuk overlooked the obvious when it believed Midwest's initial results. It points to two pieces of Ms. Scott's testimony in support of that claim. First, Ms. Scott explained that Keokuk usually tested the purity of its glycerin internally, in parallel with Midwest's testing. The internal tests, Midwest reasons, should have revealed the error in Midwest's results. Second, when Midwest's counsel showed Ms. Scott the errant results, she testified that she had never seen them before, and that if she had, she would have immediately called Midwest to find out what had happened. The results, she said, were "shockingly different" from earlier batches, and "didn't make sense." The problem was "obvious" to her.

Neither point persuades. Although Ms. Scott testified that Keokuk usually did its own testing, she could not testify (nor is there other evidence showing) that Keokuk did test the relevant batch or what its results were. Keokuk was not obligated to test the batch. *See Union County, IA v. Piper Jaffray & Co., Inc.,* 741 F.Supp.2d 1064, 1113 (S.D. Iowa 2010) ("[T]he Court is not inclined to find, as a matter of law, that the County did not justifiably rely . . . simply because it did not undertake to . . . search[ ] for "red flags" on its own."); *Cedar Falls Bldg. Center, Inc. v. Vietor,* 365 N.W.2d 635, 639 (Iowa Ct. App. 1985) ("When an individual acts on the representations of another and relies on them in good faith, he has no duty to further investigate."). And while Ms. Scott's chemistry expertise would usually be attributable to Keokuk, she was not its agent when it received Midwest's test result: she was on leave in Kazahstan. *See* Restatement (Third) of Agency § 5.03 (2006) ("[N]otice of a fact that an agent knows . . . is imputed to the principal."). Ms. Scott testified that she was the only employee the error would have been obvious to. Given that testimony, a reasonable jury need not conclude that Keokuk's reliance was unjustified or negligent.

### C. Causation

▪ "Proximate cause is an element of negligent misrepresentation. Conduct is a proximate cause of damage when it is a substantial factor in producing damage and the damage would not have happened except for the conduct." *Boone County Community Credit Union v. Masel,* 665 N.W.2d 440, 3 (Iowa Ct. App. 2003). Midwest argues that GreenMan would have called off the deal even if the test results had been correct; the damage would have happened with or without its conduct. The letter of intent required at least 95% pure glycerin, and the corrected test results showed a 90.3% purity level. Only two of the previous batches had met that 95%

purity level. The parties also wanted the glycerin to meet other quality requirements, including limits on the water, salts, and methanol. The corrected test results did not meet those requirements, and very few of the previous batches met any of those requirements. Midwest argues that the deal would not have closed under those circumstances.

The record does not compel that conclusion. Taking the evidence in the light most favorable to Keokuk, it shows an ongoing dialogue between Keokuk and GreenMan about the closing conditions. The purity results had been steadily improving over the three months between when the letter of intent was signed and the July 7th test; GreenMan's CEO testified that as long as the results were in the 90% range, GreenMan's Board thought the quality requirements were within reach. But when the last test result arrived, it "finally said... enough is enough, this is too far off the 95 percent to move forward." Given that testimony, a reasonable jury could find that the test result ended an otherwise potentially viable deal.

## D. Damages

█ In order to recover on either a breach of contract or a negligent misrepresentation theory, Keokuk must show that it suffered a loss. *See* Restatement (Second) of Torts § 522 (1977); *SHI R2 Solutions, Inc. v. Pella Corp.*, 864 N.W.2d 553, 7 (Iowa Ct. App. 2015). Midwest argues that Keokuk in fact benefited from avoiding the sale, reasoning that what Keokuk would have received was worth less than its operation. Its counsel, at oral argument, added that Keokuk later sold the business to another party for equity it believed was worth $4.5 million [3]—successfully mitigating its damages.

There are three sets of numbers at issue in assessing that argument: (1) the March 2009 appraisal, valuing Keokuk at between $3.7 million and $4.5 million; (2) GreenMan's offered purchase price, $1.35 million and a 10% equity stake; and (3) the other sale's purchase price, equity Mr. Rothgeb valued at $4.5 million. The Court doubts whether a reasonable jury could believe most of those numbers. Midwest raised important admissibility concerns about the evidence used to value the 10% interest, and the Court has its own serious questions about the reliability of the methods used to value Keokuk's operation, the 10% interest, and the equity interest Keokuk ultimately received. But a reasonable jury could infer three things from the available evidence. First, the GreenMan deal promised a $1.35 million dollar payment. Second, Keokuk tried to, but could not, mitigate its damages. *See* Restatement (Second) of Contracts § 350 (1981) ("The injured party is not precluded from recovery... to the extent that he has made reasonable but unsuccessful efforts to avoid loss."), *cited with approval in Hunter v. Board of Broadlawns Medical Center*, 481 N.W.2d 510, 517 (Iowa 1992). Third, Keokuk's operation was worth less than $1.35 million: it never refined industrial-grade glycerin, and never turned a profit. The highest offer Keokuk received was $1.5 million, and it ultimately traded its operation for a worthless promise of equity. A reasonable jury could, therefore, find that Keokuk was promised more in the GreenMan deal than it was giving up, and that it suffered damages when the deal failed.

## IV. CONCLUSION

Because Keokuk's evidence permits a jury finding in its favor, but Mr. Rothgeb

---

**3.** Defense counsel indicated that Keokuk sold its glycerin operation for $25,000 and equity worth $4.5 million. The only record on this sale comes from Mr. Rothgeb's deposition, and he testified that the $25,000 purchase price was for a separate transaction.

has not shown an individual right to recover, summary judgment is granted against Mr. Rothgeb's claims and denied against Keokuk's. **IT IS ORDERED** that Defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART.**